COMMONWEALTH EDISON COMPANY, Plaintiff-Appellee, v. NATIONAL UNION FIRE INSURANCE COMPANY *et al.*, Defendants-Appellants.

First District (3rd Division)   Nos. 1—99—3524, 1—99—3800 cons.

Opinion filed June 20, 2001.

Clausen Miller, P.C., of Chicago (James T. Ferrini, Mary F. Standord, and

Susan Condon, of counsel), for appellant National Union Fire Insurance Company of Pittsburgh, PA.

Baker & McKenzie, of Chicago (Ronald L. Ohren, of counsel), for appellant Asplundh Tree Expert Company.

Johnson & Bell, Ltd., of Chicago (William McVisk and Mindy Kallus, of counsel), for appellee.

JUSTICE BURKE delivered the opinion of the court:

Defendants National Union Fire Insurance Company of Pittsburgh, PA. (National), and Asplundh Tree Expert Company (Asplundh) appeal from two orders of the circuit court denying National's and Asplundh's motions for summary judgment and granting summary judgment in favor of plaintiff Commonwealth Edison Company (Edison) in Edison's declaratory judgment action seeking indemnification, as an additional insured in a policy issued to Asplundh by National, for $1.5 million in settlement funds Edison paid in an underlying wrongful death lawsuit. On appeal, National and Asplundh contend that: (1) the trial court erred in granting Edison indemnification for the $1.5 million it paid in settlement based only on Edison's reasonable anticipation of liability arising out of Asplundh's actions; (2) Edison violated the voluntary payment clause in the policy when it settled the underlying lawsuit without National's consent, precluding indemnification under the policy; and (3) Edison's self-insured retention under a separate policy affected National's duty to indemnify Edison. For the reasons set forth below, we affirm.

In 1992, Patrick Fierce (Fierce), special administrator of the estate of Diana Fierce, deceased, filed a four-count complaint against Edison and Asplundh. Fierce's complaint (*Fierce* action) alleged that on or about July 2, 1992, Diana Fierce came into contact with a downed power line in the backyard of property she owned at 8116 Carolwood Avenue, Woodridge, Illinois, causing her serious internal and external injuries which subsequently caused her death. Fierce subsequently filed several amended complaints. Count I of the fifth amended complaint was a claim for "wrongful death" against Edison and alleged, in part, that Edison failed to "trim or remove trees" located within its easement to avoid the damaging or breaking of the power lines. Count II was a claim against Edison for violation of the Illinois Public Utilities Act (220 ILCS 5/1—101 *et seq.* (West 1992)). Count III was also a claim against Edison under the Public Utilities Act which sought punitive damages. Count IV was a claim based on negligence against Asplundh, alleging that Asplundh was in the business of tree trim-

ming, was hired by Edison pursuant to a contract to trim trees surrounding power lines on and along easements owned by Edison, and had a duty to inform Edison of any damage to high voltage electrical power lines. The complaint further alleged that Asplundh, by and through its agents and employees, was negligent in failing to comply with the terms of its contract in the following respects:

> "(a) Failed to properly trim or remove tree or trees located within the aforesaid easement as needed to avoid said tree or trees from damaging and breaking the power lines of COMMONWEALTH EDISON;
>
> (b) Failed to provide adequate warning of the danger of contact between power lines and trees ***."

Fierce maintained that Asplundh's violation of its duties caused Diana Fierce's injuries. Count V was a claim under the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 1992)) for "infliction of emotional distress" on behalf of Patrick Fierce, who alleged that he had witnessed Diana's electrocution and had entered the "zone of danger" created by the downed power lines when he went to her aid.

On February 23, 1994, AIG Risk Management, Inc., on behalf of National as National's claims management analyst, sent a letter to Edison stating that National would defend Edison in the *Fierce* action, under a reservation of rights, pursuant to the coverage under policy No. RMGL3257964, effective from August 1, 1991, to August 1, 1992. The *Fierce* action was settled by the parties for $3 million, with Asplundh and Edison agreeing to each pay $1.5 million to Fierce.

On September 18, 1995, Edison filed a complaint against National, seeking a declaration that National breached its obligations to Edison as an additional insured under policy No. RMGL3257964 by refusing to fund all or a portion of Edison's contribution to the settlement in the *Fierce* action and that National must reimburse Edison $1.5 million plus interest under the policy.[1]

On December 18, 1995, National filed an answer to Edison's complaint for declaratory relief which admitted that Edison was an additional insured, but only with respect to "liability arising out of operations performed for [Edison] by or on behalf of Asplundh." National denied that Edison was an additional insured under the policy with respect to the *Fierce* action because Edison's liability did not arise out of operations by or on behalf of Asplundh. National fur-

---

[1]The policy issued to Asplundh was a "fronting" policy, requiring that Asplundh repay National for any funds National was required to pay on Asplundh's behalf. As indicated by the arguments in the parties' briefs, Asplundh, therefore, has taken a position similar to National that National was not required to reimburse Edison for the settlement of the *Fierce* action.

ther denied all other material allegations against it. National also alleged three affirmative defenses. As its first affirmative defense, National stated that "National Union [had] no obligation under the policy to indemnify Com Ed for any monies Com Ed paid to settle liability that did not arise out of Asplundh's operations." As its second affirmative defense, National stated that it did not have a duty to indemnify Edison based on a policy provision that prohibited the insured from voluntarily making any payment, assuming any obligation, or incurring any expense without National's consent and that Edison failed to obtain National's consent before agreeing to pay $1.5 million to settle the *Fierce* action. As its third affirmative defense, National stated, in the alternative, that if it was liable to Edison, that liability would be subject to the "other insurance" provisions of the policy. National argued that its liability for the settlement amount would be limited, according to the terms of the policy, by the amount of other applicable primary insurance coverage.

Policy No. RMGL3257964, issued by National and naming Asplundh as the "named insured," effective from August 1, 1991, to August 1, 1992, contained a $5 million "general aggregate limit" of coverage. An endorsement to the policy stated that Edison was named as an additional insured, but only with respect to liability arising out of the operations of Asplundh. The policy also contained the following relevant language under the "Commercial General Liability Form":

"Throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations ***. The words 'we,' 'us,' and 'our' refer to the company providing this insurance.

\* \* \*

SECTION IV—COMMERCIAL GENERAL LIABILITY
CONDITIONS

\* \* \*

4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below."

The policy also stated:

"No insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."

The parties filed cross-motions for summary judgment. Asplundh argued that in order to obtain summary judgment, Edison "must first prove as a matter of law that it had *liability*—not merely *exposure*—in the underlying lawsuit" and that Edison must secondly prove that "every dollar of its $1.5 million payment was for liability arising out of operations performed for [Edison] by or on behalf of [Asplundh] (and, thus, that not one single dollar of that payment was for [Edison's] own liability on account of its own conduct." (Emphasis in original.) Asplundh further argued that Illinois case law precluded Edison from attempting to apportion liability between it and Asplundh for the first time in a declaratory judgment action. National made similar arguments in its motion to those made in Asplundh's motion. Edison argued in its motion for summary judgment that it was entitled to indemnification from National for the settlement amount it paid in the *Fierce* action because the settlement was made with reasonable anticipation of liability arising out of Asplundh's operations and because Edison had given National notice of its intent to settle and the opportunity to participate in the settlement.

On September 7, 1999, the parties filed a stipulation with respect to their cross-motions for summary judgment. The following statements were included in the stipulation: $1.5 million was paid, under National's policy issued to Asplundh, on behalf of Asplundh, to settle the *Fierce* action; Edison paid $1.5 million to settle the *Fierce* action; prior to the settlement of the *Fierce* action, National was aware that Asplundh and Edison had discussed the possibility of subsequently reallocating the settlement between them; National did not play a part in the negotiations between Edison and Asplundh and was not advised that they had made a decision to fund the settlement on a 50/50 basis until after the agreement had been reached; Edison never subsequently sought to reallocate the settlement with Asplundh; Edison and Asplundh denied liability at the time of the settlement of the *Fierce* action, and the parties, including National, and their attorneys "believed that both [Edison] and [Asplundh] had strong defenses to the Fierces' allegations against them"; National agreed that the *Fierce* action should be settled to avoid the risk of a larger jury verdict against Edison and Asplundh, due in part to sympathy felt by jury members based on the manner of Diana Fierce's death, and that $3 million was a reasonable settlement amount on behalf of Edison and Asplundh; that a storm had passed through the area where the accident occurred within several hours prior to the accident; and under an excess policy with limits of $20 million that Edison had purchased from National, Edison had a self-insured retention of $2.5 million per occurrence with no aggregate limit, and an additional self-insured retention of $2.5 million subject to an aggregate limit of $5 million.

On September 13, 1999, the trial court granted Edison's motion for summary judgment and denied National's and Asplundh's motions. The trial court found that the underlying *Fierce* complaint set forth allegations that "at least establish[ed] some liability" on the part of Asplundh. The trial court further found that Edison did not need to provide *de novo* proof of Asplundh's liability in the *Fierce* action to be entitled to indemnification for settling that case and, based on "all the information contained in *** [Fierce's] complaint, [Edison] settled in reasonable anticipation of litigation arising out of the operations of Asplundh." Additionally, because Edison repeatedly gave National notice of the opportunities to settle the *Fierce* action, the trial court further found that Edison's settlement payments, without National's consent, did not affect Edison's right to indemnification. Lastly, the trial court found that based on the language of National's policy, Edison's self-insurance "should not be treated as other insurance," which would have precluded indemnification coverage under National's policy.

On October 5, 1999, the trial court also made the following findings and declarations:

"1. ComEd is entitled to indemnity from National Union for the full amount of its payment of $1.5 million to settle the *Fierce* claim, together with prejudgment interest thereon at the statutory rate of 5% per annum from May 18, 1995 plus post-judgment interest at the rate of 9% per annum from the date of this judgment.

2. The total of prejudgment interest owed to ComEd as of the date of this Order is $328,562.

3. ComEd is entitled to its costs and expenses associated with this action. ComEd's costs in this action total $476.80.

4. Judgment is entered against National Union in the total amount of $1,829,038.80."

This appeal followed.

National first contends, relying primarily on *United States Fidelity & Guaranty Co. v. Continental Casualty Co.*, 198 Ill. App. 3d 950, 556 N.E.2d 671 (1990), that "a party who pays funds to settle a claim against a tortfeasor whose liability allegedly 'arose out of' the operations of a second tortfeasor, must seek allocation of the tortfeasors' liability in [an] underlying action or will be barred from seeking reimbursement therefor in a subsequent declaratory judgment action." National argues that, because Edison did not seek to apportion liability between itself and Asplundh in the underlying *Fierce* action, Edison was barred from seeking, in its declaratory judgment action, indemnification for the $1.5 million settlement it paid. National notes that it gave notice to Edison that it was reserving its right to deny

coverage to Edison for liability that did not arise out of the operations of Asplundh. In its brief, Asplundh similarly relies on *Continental Casualty*, in support of its argument that Edison was not entitled to indemnification because there was no finding or allocation of liability between Edison and Asplundh in the underlying *Fierce* action. National also contends that even if Edison's claim is not barred, the trial court erred because, under the terms of National's policy, Edison was not entitled to indemnity on all the settlement funds it paid in the *Fierce* action without submitting proof that Edison was actually liable and that the full extent of its liability "arose out of Asplundh's operations," as opposed to Edison's own liability. National maintains that Edison was subject to potential liability that would not have been covered by the policy, such as liability for Edison's failure to replace damaged conductors and for punitive damages, because the liability would not have arisen from Asplundh's operations. National and Asplundh also argue that the trial court improperly relied on *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, 643 N.E.2d 1226 (1994), in support of its finding that Edison was entitled to indemnification under National's policy.

Edison contends that it was not required to establish its liability "*de novo*" in the underlying *Fierce* action in order to receive indemnification from National, and argues that Illinois law only requires that there be a "but for" causal relationship between the additional insured's liability and the operations of the named insured for coverage under National's policy to apply. Edison argues that based on the uncontradicted evidence, it reasonably anticipated liability arising from Diana Fierce's death due to Asplundh's tree trimming. Edison maintains that the policy only required that Edison's liability arise out of Asplundh's "operations," as opposed to Asplundh's "fault." Edison further argues that it was not required to obtain an allocation of damages in the underlying *Fierce* action to establish coverage under National's policy and that it was entitled to coverage even if Asplundh was found not to be at fault. Edison distinguishes *Continental Casualty*, arguing that that case involved a claim for equitable contribution between a primary insurer and an excess insurer for the same insured and not an action, as here, by an insured for indemnification under a policy. Edison maintains that the trial court correctly applied *Gypsum* to the present case.

•1, 2 Review of a trial court's ruling on a motion for summary judgment is *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party's right to judgment is clear and free from

doubt." *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113, 649 N.E.2d 1323 (1995). "[I]f an insured settles an underlying claim prior to verdict, it must show that it settled an otherwise covered loss in 'reasonable anticipation of personal liability.'" *Gypsum*, 268 Ill. App. 3d at 625, quoting *WestAmerica Mortgage Co. v. Tri-County Reports, Inc.*, 670 F. Supp. 819 (N.D. Ill. 1987).

The parties in the present case rely primarily on *Continental Casualty* and *Gypsum* in support of their arguments. In *Continental Casualty*, the plaintiff primary insurer appealed the dismissal of its complaint against the defendant excess insurer in which the plaintiff sought recovery of the settlement amount the plaintiff paid in an underlying personal injury case, brought by the insured construction company's employee and his wife, allegedly in excess of its obligations pursuant to the settlement agreement. The plaintiff had issued two primary policies to the construction company: (1) a workers' compensation policy (workers' policy) with a coverage limit of $500,000, covering construction work being performed at a hospital; and (2) a general liability policy, which also had a limit of $500,000 coverage, naming the hospital as an additional insured but only with respect to liability arising out of operations performed by the construction company for the hospital. The defendant issued an umbrella excess policy to the construction company with a limit of $5 million. *Continental Casualty*, 198 Ill. App. 3d at 952. Subsequently, an employee of the construction company was injured while working at the hospital and he filed a workers' compensation claim against his employer and a personal injury lawsuit against the hospital. The hospital then filed a third-party complaint for contribution or indemnification against the construction company.

After the plaintiff insurer paid the injured employee's workers' compensation claim pursuant to the workers' policy, it obtained a subrogated interest in the amount of the claim. The employee's lawsuit was later settled for $2,225,000, and the workers' compensation lien was "compromised" to a sum of $225,000. The plaintiff paid $775,000 and forgave its workers' compensation lien of $225,000, for a total of $1 million in liability, and the defendant paid $125,000 toward the settlement. Other, unnamed defendants, who were not parties to the appeal later filed by the plaintiff, paid the balance of the settlement. In a subsequent order by the trial court, it dismissed the hospital's third-party claim, and the settlement amount was restated as $2,450,000, with $225,000 of the amount attributed to the plaintiff's "forgiveness" of the workers' compensation lien. *Continental Casualty*, 198 Ill. App. 3d at 953.

The plaintiff then filed a declaratory judgment action, alleging

that the settlement of the underlying case was predicated on an agreement between itself and the defendant that the employee's injuries were solely the fault of his employer, the construction company, and that no fault was attributable to the hospital. Although the plaintiff admitted that under the workers' policy it had a duty to indemnify the construction company up to the limit of $500,000, it also claimed that the remaining $500,000 that it had paid toward the settlement under the general policy was not on behalf of any liability on the part of the hospital and was paid with the intention that the defendant would reimburse that amount under the excess policy in recognition that the construction company was 100% liable. The plaintiff sought a declaration that the defendant, therefore, owed it $500,000 plus interest. The trial court dismissed the plaintiff's complaint pursuant to the defendant's motion, in which the defendant argued that "any determination of liability as between [the hospital] and [the construction company] was waived by the settlement and concomitant dismissal with prejudice of [the hospital's] third-party complaint against [the construction company]." *Continental Casualty*, 198 Ill. App. 3d at 953.

On appeal, the *Continental Casualty* court stated that in order to determine whether the defendant was obligated to pay a sum under the excess policy, "a determination [had] to be made as to the degrees of liability between [the hospital and the construction company]." The court noted that there was no breakdown of the settlement amount that was paid as to the liability between the construction company and hospital. The court found that the plaintiff properly paid $1 million of the settlement on behalf of the construction company and hospital pursuant to the $500,000 limits of the two policies the plaintiff issued and that the defendant had paid the $125,000 in excess. The *Continental Casualty* court further stated:

> "In order to agree with [the plaintiff's] position that the settlement obligation should have been distributed differently as between [the plaintiff] and [the defendant], a determination as to the degree of liability attributed to [the construction company and the hospital] would have had to have been made by the trial court." *Continental Casualty*, 198 Ill. App. 3d at 954-55.

Finding that a determination as to the relative degree of liability of the hospital and the construction company was not appropriate to be raised for the first time on appeal, the *Continental Casualty* court affirmed the dismissal of the plaintiff's complaint.

In *Gypsum*, the plaintiff insured filed a declaratory judgment action against numerous insurers to receive, in part, indemnification for a settlement the plaintiff paid in underlying lawsuits against it seeking to recover for property damage caused by materials containing

asbestos provided to the underlying claimants by the plaintiff. The trial court found in favor of the plaintiff insured, granting it partial summary judgment and ordering the defendant insurers to indemnify the plaintiff for the reasonable settlement amounts. The plaintiff had settled seven of the underlying claims against it for property damage and one other underlying claim that had been tried to a verdict in which damages had been awarded against the plaintiff. On appeal of the trial court's finding that the plaintiff was entitled to indemnification for the damages on the jury verdict and the settlement funds in the underlying cases, the defendant insurers argued that the plaintiff insured was required to offer "actual facts" in its declaratory judgment action that damage occurred in each of the underlying cases in order to be entitled to indemnification.

The appellate court in *Gypsum*, prior to resolving the "quantum of proof" necessary in the declaratory action for the plaintiff insured to be entitled to indemnification, first determined that if the defendant insurers "were correct in their contention that [the plaintiff insured] was required to prove *de novo* that there was contamination resulting from a release of asbestos fibers in each one of the underlying cases, the record *** support[ed] the trial court's finding that such damage existed in each of the underlying actions." *Gypsum*, 268 Ill. App. 3d at 616.

Despite the *Gypsum* court's agreement with the trial court that the *de novo* proof presented by the plaintiff insured "in the coverage trial" was sufficient to support the insured's right to indemnification, the court further stated that the plaintiff "as an insured seeking coverage would not be required to establish its own liability in the underlying actions by independent proof." *Gypsum*, 268 Ill. App. 3d at 621. With respect to the underlying action that had been tried to a verdict, the *Gypsum* court stated: "Irrespective of the quantum of proof necessary to establish property damage, [the plaintiff] as an insured in a declaratory action does not have to prove *de novo* the existence of damage in the underlying action, *i.e.*, its own liability. The adverse verdict returned by the jury and subsequent entry of judgment conclusively established [the plaintiff's] liability ***." 268 Ill. App. 3d at 623.

The *Gypsum* court then turned to the seven underlying cases that the plaintiff had settled. The court stated that, as a general rule, "if an insured settles an underlying claim prior to verdict, it must show that it settled an otherwise covered loss in 'reasonable anticipation of liability.' " *Gypsum*, 268 Ill. App. 3d at 625, quoting *WestAmerica Mortgage Co. v. Tri-County Reports, Inc.*, 670 F. Supp. 819 (N.D. Ill. 1987). The court agreed that this rule avoided placing insureds in the

position of having to refute liability in the underlying action until settlement and then instantly turn around and prove their own liability in the insurance action. According to the *Gypsum* court, the rule also avoided a "chilling effect" on settlements as insureds would tend to choose to vigorously defend tort actions as opposed to settling them if there was no hope of insurance reimbursement. *Gypsum*, 268 Ill. App. 3d at 626. The *Gypsum* court therefore concluded that the insured "need only show that it had a reasonable anticipation of liability when it settled the underlying cases." 268 Ill. App. 3d at 626.

The *Gypsum* court also disagreed with the defendant insurers' contention that the insured must offer proof of property damage through "actual facts" and not through testimony, evidence or depositions obtained in the underlying cases, which had been settled, because such evidence would be hearsay. In allowing the evidence, the court reasoned that the evidence from the underlying cases would not constitute hearsay because the evidence would not go to the issue of the existence of damages, as argued by the defendants, "but rather to whether [the plaintiff insured] had a reasonable anticipation of liability in the cases which it settled and whether the damage was the type of damage covered by the policy with respect to the *** case, which was tried to an adverse verdict." *Gypsum*, 268 Ill. App. 3d at 626. The *Gypsum* court further stated:

> "Basically, the nature of the pleadings, the pretrial discovery, evidence and testimony presented during the trial prior to settlement would be relevant to establish the reasonableness of the insured's anticipation of liability. ***
>
> The determination of whether [the insured's] anticipation of liability was reasonable would naturally turn on the quality and quantity of proof which [the insured] would expect to be offered against it in the underlying action. The depositions from the underlying cases, as well as the trial testimony in those cases settled after the trial had begun, offer the best indication of what evidence [the insured] would expect to have offered against it in the underlying action." *Gypsum*, 268 Ill. App. 3d at 626-27.

Having reviewed the cases relied on by the parties, we find that *Gypsum* is controlling on the issue here. As in *Gypsum*, the present case involves an effort by Edison, the insured, to obtain indemnification for a settled claim without an actual finding of liability. Similarly, as in *Gypsum*, in order to receive indemnification for the settlement payment it made in the *Fierce* action, Edison was only required to show that it settled an otherwise covered loss in "reasonable anticipation" of personal liability. In order for Edison's potential liability in the *Fierce* action to have been covered by National's policy, therefore,

the loss for which it would have been liable, *i.e.*, Diana Fierce's death and related damages, must have arisen out of Asplundh's operations, according to the terms of the policy. The pleadings and the evidence presented in both the *Fierce* action and in the insurance coverage case in the trial court contain sufficient evidence to indicate that the loss arose out of Asplundh's operations. Count I of the *Fierce* complaint specifically alleged that Edison was negligent in failing to trim or remove trees within its easement to prevent the breaking of power lines. The record indicates that there was evidence to support that allegation. For example, Fierce's attorney had retained an expert, John St. Clair, an electrical engineer, who testified during an evidence deposition in the present case that continuous and long-term contact with tree branches caused damage to the covering of the power line involved in Diana Fierce's accident. It was also his opinion that if proper tree trimming had been performed, the power line would not have come down. St. Clair assisted Fierce's attorney in preparing discovery responses based on his opinions. A number of employees of Asplundh, the company responsible for the tree trimming, were also identified as potential witnesses in the *Fierce* action.

Additionally, while the cross-motions for summary judgment were pending in the trial court, the parties stipulated that all the parties involved in the *Fierce* action, including National, agreed that the *Fierce* action should be settled to avoid the risk of a potentially large jury verdict and that paying $3 million on behalf of both Edison and Asplundh was a reasonable settlement. The stipulations also indicated that the lead trial attorneys for both Asplundh and Edison in the *Fierce* action "discussed their views concerning the strengths and weaknesses of the [*Fierce*] case and the defenses in the event the case was tried." In the *Fierce* action, National paid $1.5 million on behalf of Asplundh to settle that case pursuant to an agreement between Asplundh and Edison that each would pay one-half of the settlement amount. Asplundh and Edison had also discussed the possibility of "subsequently attempting to reallocate the settlement between them."

●3 Based on this record, it is clear that Fierce intended to show that a fallen power line caused Diana Fierce's death and that improper tree trimming was at least a major contributing factor to the damage to the line. The record also reveals that Edison, Asplundh, and National carefully weighed their options in electing to settle that lawsuit as opposed to contesting the allegations at trial and risking a larger jury verdict against both Edison and Asplundh. Despite the additional independent allegations against Edison, Asplundh's allegedly negligent tree trimming was a primary focus of the litigation. We therefore find that plaintiff entered into the settlement under the rea-

sonable anticipation that it would have been found at least partially liable for Diana Fierce's death as a result of the allegedly negligent tree trimming by Asplundh. This would have been a covered loss under National's policy because the loss arose out of Asplundh's operations. Accordingly, we hold that the trial court properly granted Edison's motion for summary judgment.

Our holding is consistent with the principles articulated in *Gypsum*. Requiring Edison to have obtained an actual allocation of liability between itself and Asplundh in the *Fierce* action, as argued by defendants, would have acted as a chilling effect on settlement of that case. The court in *Gypsum* recognized that if an insured was faced with the choice of defending a lawsuit against it or settling the claim without any hope of receiving insurance reimbursement or indemnification, the insured would choose to vigorously defend the lawsuit. *Gypsum*, 268 Ill. App. 3d at 626. Additionally, requiring an insured, such as Edison, to establish actual liability in order to receive indemnification would place the insured in the difficult position of having to refute liability in the underlying lawsuit and then, after obtaining a settlement, turn around and prove its own liability in order to succeed in a subsequent insurance coverage action. *Gypsum*, 268 Ill. App. 3d at 626. These are relevant concerns in the present case, as well, and we find that Edison is entitled to indemnification under National's policy for its reasonable settlement.

National next contends that it has no duty to indemnify Edison because Edison paid the settlement in the *Fierce* action without National's consent in violation of the terms of the policy. National maintains that "notices" from Edison of "opportunities to settle" the *Fierce* action were insufficient to defeat the voluntary payment provision in the policy. National claims that it was not made fully aware of the agreement between Edison and Asplundh to settle the *Fierce* action until after the payment had been made.

Edison argues that because National made a reservation of rights and relinquished control of Edison's defense in the *Fierce* action, Edison had a right to enter into a reasonable settlement after it gave National "notice" and an opportunity to participate in the settlement. Edison also argues that National must show that it was prejudiced by any breach of the voluntary payment clause in the policy in order to avoid coverage and that National has not shown any such prejudice. Edison further argues that National also waived any right to rely on the voluntary payment clause because National participated in the settlement on behalf of Asplundh with "full knowledge" that Edison and Asplundh had agreed that Edison would fund half of the settlement but reserved its right to assert coverage under the Asplundh

policy. Edison also notes that because the policy National issued to Asplundh was a fronting policy, requiring Asplundh to eventually reimburse National for any payments made pursuant to the policy, National had been deferring to Asplundh on various decisions made in the *Fierce* action and National cannot now argue that it did not have notice of the agreement to settle.

We first note that National's reliance on *Piper v. State Farm Mutual Automobile Insurance Co.*, 1 Ill. App. 2d 1, 116 N.E.2d 86 (1953), in support of its argument that Edison was required to obtain National's consent to the settlement, is misplaced. *Piper* did not involve a case, as here, where the defendant insurer provided a defense to the plaintiff under a reservation of rights and then relinquished control of the defense before invoking the prohibitions of the voluntary payment clause following the plaintiff's settlement. Although the insured in *Piper* settled with certain claimants without the insurer's consent, coverage for the insured had been revoked prior to the accident at issue based on a failure to pay insurance premiums. *Piper*, therefore, does not support National's argument here that Edison was still required to obtain National's consent for the settlement despite the fact that Edison was represented by independent counsel, provided by National, in the *Fierce* action.

Edison relies on several cases from other jurisdictions, including *Cay Divers, Inc. v. Raven*, 812 F.2d 866 (3d Cir. 1987), which address similar issues. In *Raven*, the plaintiff, an aquatic sports shop, obtained an insurance policy with Lloyds of London. The plaintiff made a claim under the policy after a diver drowned and a wrongful death lawsuit was filed against the plaintiff. The plaintiff then filed a declaratory judgment action seeking a declaration that the defendant had a duty to defend the plaintiff in the underlying action. The district court ordered the defendant to defend the action, reserving judgment on the issue of the defendant's liability for coverage under the policy. The defendant agreed to defend under a reservation of rights and provided an independent attorney to the plaintiff. On the day of trial, the underlying action was settled, and the plaintiff moved for summary judgment to force the defendant to indemnify it for the settlement amount. The defendant cross-moved for summary judgment, arguing that the plaintiff violated the "Duties of Insured" clause of the policy because the settlement constituted an "admission of liability" without the consent or authorization of the defendant. The district court granted the defendant's motion for summary judgment. On appeal of the trial court's grant of summary judgment to the defendant insurer, the *Raven* court stated:

"We therefore hold that when a complaint, or a part of it, in an

action against an insured is arguably within the scope of the insurance coverage, an insurer's discharge of its duty to defend by providing independent counsel, even though reserving the right to contest coverage, relieves it of control over the litigation, and a reasonable settlement effectuated by the insured does not bar an action for indemnification against the insurer. Accordingly, we reverse the district's grant of summary judgment in favor of [the defendant]." *Raven*, 812 F.2d at 869-70.

●4 In the present case, as in *Raven*, the record reveals that National agreed to provide a defense for Edison in the *Fierce* action under a reservation of rights and then relinquished control of that defense because of the potential conflict of interest. As indicated by the parties, the record also contains various letters from Edison and its attorneys requesting that National settle the *Fierce* case. Although National contends that it did not actually learn of the agreement between Asplundh and Edison to each pay 50% of the settlement amount until "after the fact," the record indicates that all the parties agreed that there was the potential for a large jury verdict and that the $3 million was a reasonable settlement amount. Because of National's reservation of rights, the settlement in the underlying case did not compromise National's ability to contest indemnification in the present action. Based on these facts, Edison was not required to obtain National's consent because National was not controlling Edison's defense due to a potential conflict of interest, National had notice of Edison's intention to settle to avoid a potentially large adverse jury verdict, and even National believed that the case should be settled.

National next contends that even if Edison is entitled to coverage, its duty to indemnify Edison is subject to Edison's self-insured retention (SIR) of $2.5 million per occurrence and $5 million in the aggregate which constitutes "other insurance" within the terms of the policy. National maintains that if Edison's SIR does not constitute "other insurance," Edison will be able to avoid its decision to "go bare," without insurance, and obtain a "windfall" at National's expense. Asplundh also argues that the SIR is "other insurance," affecting any duty National has to indemnify Edison for the settlement amount.

Edison, admitting that it is self-insured for up to $5 million per occurrence, contends that self-insurance is not "other insurance" and is, in fact, "no insurance." Edison claims that Illinois law does not equate self-insurance with insurance and has held that self-insurance is not subject to "other insurance" clauses. Edison also argues that even if the SIR was insurance, that insurance did not apply because Edison made a "directed tender" to National, preventing National from then compelling Edison's self-insurance to contribute to covering the loss.

●5 The construction of an insurance policy's provisions is a question of law. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 283 Ill. App. 3d 630, 649 (1996). To ascertain the meaning of the policy's words and the intent of the parties, the court must construe the policy as a whole with due regard to the risk undertaken, the subject matter that is insured, and the purposes of the entire policy. *Outboard Marine*, 283 Ill. App. 3d at 649; see *Western Casualty & Surety Co. v. Brochu*, 105 Ill. 2d 486, 493, 475 N.E.2d 872 (1985). The terms of an insurance policy must be read according to their plain and ordinary meaning, and a court should not search for an ambiguity where there is none. *Allstate Insurance Co. v. Smiley*, 276 Ill. App. 3d 971, 977, 659 N.E.2d 1345 (1995). If the words in a policy are susceptible to more than one reasonable interpretation, they are ambiguous and will be construed in favor of the insured and against the insurer that drafted the policy. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 74, 578 N.E.2d 926 (1991).

●6 Excess or secondary insurance coverage is coverage in which liability attaches under the policy only after a "*predetermined* amount of primary coverage has been exhausted." (Emphasis in original.) *Outboard Marine*, 283 Ill. App. 3d at 652. In Illinois, pursuant to the principle of "horizontal exhaustion," all underlying coverage must be exhausted before excess coverage may be reached. *Gypsum*, 268 Ill. App. 3d at 653-54; *Missouri Pacific R.R. Co. v. International Insurance Co.*, 288 Ill. App. 3d 69, 81, 679 N.E.2d 801 (1997).

In *Missouri Pacific*, the plaintiff insured employer filed a declaratory judgment action against a number of excess insurers seeking a declaration that it was entitled to indemnification for certain noise-induced hearing loss and asbestos exposure claims. The claimants had work histories with the plaintiff spanning over 73 years, beginning in the 1920s. The plaintiff maintained SIRs between 1934 and 1986 and carried no insurance prior to 1934. The plaintiff purchased the relevant excess policies from the insurers between 1957 and 1986. The total of the SIRs underlying those policies was over $67 million. *Missouri Pacific*, 288 Ill. App. 3d at 72.

Answering a certified question from the trial court regarding the effect of the plaintiff's SIRs, the *Missouri Pacific* court agreed with the defendant insurers that the plaintiff's SIRs constituted primary insurance and should be exhausted before the insurers were liable for excess coverage. The insurers' argument was based on two grounds: (1) the distinct and unique nature of excess insurance coverage; and (2) the plain language of the policies at issue. *Missouri Pacific*, 288 Ill. App. 3d at 80. With respect to the first ground, the *Missouri Pacific* court stated:

"Both *United States Gypsum* and *Outboard Marine* support the proposition that the SIRs constitute primary coverage and thus that Missouri Pacific must exhaust the SIRs before looking to the insurers for coverage. Like the fronting insurance in *United States Gypsum*, which effectively constituted self-insurance, and the period of no insurance in *Outboard Marine*, which is the equivalent of self-insurance, the SIRs in the present case constitute primary coverage. To hold otherwise would allow Missouri Pacific to manipulate the source of its recovery and avoid the consequences of its decision to become self-insured, conduct we found unacceptable in *United States Gypsum* and *Outboard Marine*. As such, Missouri Pacific must exhaust the SIRs before looking to the insurers for coverage." *Missouri Pacific*, 288 Ill. App. 3d at 82.

Also, with respect to the insurers' second ground, that the plaintiff's SIRs constituted "other insurance" within the meaning of the policies, the *Missouri Pacific* court found that the "other insurance" language in the policies required the plaintiff to exhaust all underlying coverage, including its SIRs, before seeking coverage under the policies. The court concluded that the language in the policies specifically required the plaintiff to exhaust other available insurance coverage before the excess insurers were required to contribute.

●7 In the present case, although the excess policy upon which Edison took its SIR is not in the record, the parties filed the following stipulation with the trial court:

"For the policy period involved in this occurrence, CECO [Edison] had purchased excess insurance coverage with NATIONAL UNION with limits of $20 million. Under the terms of the NATIONAL UNION excess policy, CECO had a self-insured retention of $2.5 million per occurrence with no aggregate limit, and an additional self-insured retention of $2.5 million subject to an aggregate limit of $5 million."

The trial court agreed with Edison that self-insurance is not "other insurance" under the policy language at issue in this case. Although the opinion in *Missouri Pacific* indicates that SIRs may, in fact, constitute primary insurance in Illinois, the facts and issues in that case are distinguishable from the facts and issues here. The policy language here makes no mention of SIRs or self-insurance in the "other insurance" clause as the policy language did in *Missouri Pacific*. Additionally, the opinion in *Missouri Pacific* did not mention that the plaintiff insured possessed any other available primary insurance except for its SIRs and the issue there involved whether the plaintiff was required to exhaust its SIRs as "primary insurance" before it could reach any coverage under the defendants' "excess" policies. In the present case, however, Edison was merely seeking to invoke coverage as an ad-

ditional insured under National's policy as primary insurance. This case, therefore, does not involve the principle of horizontal exhaustion that was addressed in *Missouri Pacific*. Here, Edison was not simply uninsured or self-insured and attempting to invoke excess coverage. Edison had primary insurance under the National policy through Asplundh and made no attempt to invoke coverage under its separate excess policy under which it had taken its SIR. Edison only elected to invoke coverage under an available primary policy, and as we stated above, Edison is entitled to indemnification pursuant to the policy's terms because it had a reasonable anticipation that its liability in the *Fierce* action arose out of Asplundh's operations. Edison sought to pursue coverage under this policy, and we find that the trial court properly granted Edison such coverage irrespective of the SIR Edison held with regard to a separate excess policy it had purchased from National.

For the reasons stated, we affirm the judgment of the circuit court.

Affirmed.

CERDA and WOLFSON, JJ., concur.