**STONE MOTOR COMPANY,**
Appellant/Cross–
Appellee,

v.

**GENERAL MOTORS CORPORATION,**
Appellee/Cross–Appellant.

Nos. 04–1838, 04–1921.

United States Court of Appeals,
Eighth Circuit.

Submitted: Jan. 13, 2005.

Filed: March 9, 2005.

John D. Beger, argued, Rolla, MO, for appellant/cross-appellee.

Jeffrey J. Jones, argued, Columbus, OH (David M. Harris and Dawn M. Johnson, St. Louis, MO, and J. Todd Kennard, Columbus, OH, on the brief), for appellee/cross-appellant.

Before WOLLMAN, MURPHY, and BYE, Circuit Judges.

MURPHY, Circuit Judge.

This dispute between Stone Motor Company (Stone), a former dealer of Chevrolet and Geo cars and trucks, and General Motors Corporation (GM), is back before the court for a second time. In *Stone Motor Co. v. General Motors Corp.*, 293 F.3d 456 (8th Cir.2002) (Stone I), we reversed in part a judgment of dismissal and remanded Stone's claims for breach of the duty of good faith and fair dealing and violations of the Missouri Motor Vehicle Franchise Practices Act. The remanded issues related to the effect of a release Stone had signed and to GM's allocation of vehicles. After the record was further developed on remand, the district court[1] dismissed Stone's remaining claims and denied GM's request for attorney fees. Stone appeals the dismissal of its good faith claim, and GM appeals the denial of fees. We affirm.

Stone purchased a Chevrolet–Geo dealership in Cuba, Missouri in 1995, and entered into a standard franchise agreement with GM. Business at the dealership did not go as well as hoped, and Stone contends that the reason for its poor return was that GM had not allocated it enough of the most desirable vehicles nor a sufficient number of vehicles. GM contends that it allocated more vehicles to Stone than it had to the previous franchisee, and that Stone received more vehicles than it was entitled under GM's standard allocation formula. After two years of poor performance, Stone decided to sell to Fairground Motors, a dealership in neighboring Rolla, Missouri. After its talks with Fairground, Stone presented the proposed sale to GM for its consideration and approval.

Under the terms of Stone's Dealer Service and Sales Agreement with GM, Stone was obligated to provide GM with written notice if it wished to transfer the dealership, and GM was required to consider and not arbitrarily refuse any proposed transfer. The franchise agreement specified factors that GM was to include in that consideration:

> factors such as (a) the personal, business, and financial qualifications of the proposed dealer operator and owners, and (b) whether the proposed change is likely to result in a successful dealership operation with acceptable management,

1. The Honorable Carol E. Jackson, Chief Judge, United States District Court for the Eastern District of Missouri.

capitalization, and ownership which will provide satisfactory sales, service, and facilities at an approved location, while promoting and preserving competition and customer satisfaction.

The contract further required GM to issue a written decision on any proposed sale within 60 days of the proposal and to include a statement of its reasons for disagreement if approval was denied. GM was also entitled under the agreement to indicate in its written response to a dealer's proposal that it would buy the dealership rather than approve its sale to a third party.

GM notified Fairground by letter on July 8, 1997 that its "application and proposal to become a Chevrolet dealer in Cuba, MO ha[d] been approved" and that GM was "prepared to appoint Fairground Motors....as an authorized Chevrolet dealer, conditioned on [its] providing [GM] with [stated] information and documentation...." Included among the listed documents that would be required prior to any execution of a franchise agreement with Fairground was a release from Stone.

At the closing of Stone's sale of the dealership to Fairground Motors on July 14, 1997, the president of Stone signed a document which:

> releas[ed] and forever discharg[ed]...General Motors Corporation, Chevrolet Motor Division of and from all, and all manner of action and actions, causes of action, suits, proceedings, debts, dues, contracts, judgments, damages, claims or demands whatsoever, in law or equity, which it or he or either of them ever had or now have against...General Motors Corporation, Chevrolet Motor Division upon or by any reason of any manner, cause or thing whatsoever occurring or existing at any time or times prior to or during the entire period of the operation or arising from the termination of [Stone Motor Company].

This release document also stated that the signing party acknowledged that it was agreeing to it "for and in consideration of the sum of One Dollar ($1.00) in hand paid by General Motors Corporation, Chevrolet Motor Division, a Delaware corporation, receipt of which is hereby acknowledged and other good and valuable consideration." Stone's president later testified that he knew that GM's approval of the proposed sale was contingent upon his signing the instrument.

Stone brought this action against GM nearly two years later, alleging in part that its unsatisfactory allocation of vehicles to the dealership breached its duty of good faith and fair dealing and violated the Missouri Motor Vehicles Franchise Practices Act, Mo.Rev.Stat. §§ 407.810–407.835 (2004) (MVFPA). The district court dismissed all claims, and Stone appealed. Our court ruled that if the release were valid, it would bar all of Stone's claims but that it was unclear whether consideration had been given for it. *Stone I*, 293 F.3d at 460–62. There also appeared to be a genuine question as to whether GM had acted in good faith in allocating vehicles among dealerships. *Id.* at 464–68. We therefore affirmed the dismissal of Stone's other claims but remanded the claims that GM had violated the MVFPA and breached its implied contractual duty of good faith and fair dealing.

After the case was returned on remand, the district court scheduled an evidentiary hearing to address the validity of the release. The parties filed a joint motion for continuance, however, because there was a pending motion by GM to compel production of documents and deposition testimony relating to the release. Stone then filed an amended complaint based on its two surviving claims, and GM responded

with a counterclaim seeking damages from Stone, including costs and attorney fees, alleging that Stone had breached the release by filing this action.

GM moved for summary judgment, contending that Stone's claims were barred by the release, that Stone had abandoned its franchise and therefore lacked standing under the MVFPA, that GM had delivered Stone more vehicles than were owed under its standard allocation system and it had not acted in bad faith, and that Stone had not shown any cognizable damages. The district court granted the motion for summary judgment on the MVFPA claim since Stone was no longer engaged in the franchise business at the time it brought this action. The court concluded that it was therefore barred from suing under the statute, and Stone has not contested this ruling on appeal. *See* Mo.Rev.Stat. 407.830 ("It shall be a defense for a motor vehicle franchisor, to any action brought under sections 407.810 to 407.835 by a motor vehicle franchisee, if it be shown that...the motor vehicle franchisee has ceased conducting its business or has abandoned. the franchise."). The motion for summary judgment was denied as to Stone's claim that GM breached its duty of good faith and fair dealing, as was a subsequent motion by GM for a scheduling conference. In denying the latter motion, the court indicated that the question of whether consideration had been given for the release was a fact issue to be determined at the previously scheduled trial.

The parties prepared for trial and submitted a joint stipulation of uncontested facts, as well as trial briefs, witness and exhibit lists, and proposed jury instructions. They also filed a number of motions in limine. On the morning of trial, the district court met with counsel and indicated that a jury panel would be available later in the day. The court then asked counsel to set out their positions on two main issues respecting Stone's claim for breach of the duty of good faith: the validity of the release and damages. The parties also were given the opportunity to state the evidence on which they relied. Included in the evidence Stone said it planned to introduce were GM's July 8, 1997 letter to Fairground Motors and the Dealer Service and Sales Agreement between the parties. In its discussion GM indicated that it would rely in part on the deposition testimony of Stone's president, Virgil Stone, and thereafter the court permitted Stone to summarize any further evidence it would offer at trial.

After hearing the presentations and arguments of the parties at the conference, the district court concluded that GM was entitled to judgment on Stone's claim. The court concluded that Stone lacked submissible evidence on damages but that the case turned on the release, ruling that the release barred Stone's claim. GM's final approval of Stone's sale to Fairground provided consideration for the release, making it a valid contract, the court concluded. The court also indicated that it intended to award attorney fees and costs to GM as damages on its counterclaim, reasoning that Stone had violated the terms of the release by bringing the lawsuit; it requested memoranda on the amount GM should be awarded. Stone filed a notice of appeal, but it was dismissed because there was not a final judgment.

The district court later issued a written order for judgment, dismissing Stone's claim and GM's counterclaim. In departing from its announced intention to award damages to GM, the court indicated that an award of attorney fees and costs would be improper in the absence of a statutory or contractual provision authorizing them. *See In re Estate of Cannamore*, 44 S.W.3d

883, 885 (Mo.Ct.App.2001) (fees appropriate "only where they are provided for by statute or by contract, where very unusual circumstances exist so it may be said equity demands a balance of benefits, or where the attorney's fees are incurred because of involvement in collateral litigation"). Both Stone and GM appeal from the judgment, and we address their arguments in turn.

We review grants of summary judgment de novo. *Lerohl v. Friends of Minnesota Sinfonia*, 322 F.3d 486, 488 (8th Cir.2003). A district court may grant summary judgment sua sponte if "the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Stone argues first that the release was not supported by consideration. GM responds that there was consideration given for the release, including its decision not to exercise its statutory right of first refusal. Its primary argument, however, is that its final approval of Stone's intended sale to Fairground served as consideration since Stone needed the approval for its sale to be consummated. GM asserts that it had made clear to Stone's president that its approval of the sale was conditioned on execution of the release. Stone responds that GM's approval was contractually required under the dealer agreement because it prohibited GM from arbitrarily refusing to approve a dealership sale and there was no evidence it had reason to refuse. *See In re Weinsaft's Estate*, 647 S.W.2d 179, 183 (Mo.Ct.App. 1983) (consideration supplied by doing something the party is not legally required to do). Stone argues further that GM had approved the sale in its letter to Fairground a week before it signed the release and that GM's decision not to exercise its right of first refusal was not consideration because that right was of no benefit to

Stone and GM's preclosing letter to Fairground had implicitly waived it.

Contrary to Stone's assertion, the terms of the Dealer Service and Sales Agreement did not require GM to approve the sale to Fairground. GM was only obligated under that agreement to consider Stone's proposal and not to turn it down arbitrarily. GM retained discretion to base its decision on "the personal, business, and financial qualifications of the proposed dealer operator and owners." It was also entitled to consider "whether the proposed change [would be] likely to result in a successful dealership operation with acceptable management, capitalization, and ownership which will provide satisfactory sales, service, and facilities at an approved location, while promoting and preserving competition and customer satisfaction." The agreement thus gave considerable discretion to weigh the proposed dealership's qualifications and analyze its prospects for success. The only restriction on that discretion was that it could not act arbitrarily, and Stone has not shown that under this agreement GM was required to approve the sale to Fairground.

Stone failed to demonstrate that GM had approved its proposed sale to Fairground before it furnished a signed release. GM's July 8, 1997 letter to Fairground did not address Stone's proposal, but rather indicated that the buyer's separate "application and proposal to become a Chevrolet dealer" had been approved. Moreover, GM expressly qualified this approval by stating that it was "prepared to appoint Fairground Motors...as an authorized Chevrolet dealer" on the "condition[ ]" that it provided the manufacturer with substantial documentation. Among the documents required before GM would execute Fairground's Dealer Sales and Service Agreement was Stone's release. The district court gave Stone the opportu-

nity to present other evidence to show that GM had approved Stone's proposal prior to its signing of the release, but Stone failed to do so. We conclude that the evidence does not show that GM had approved Stone's proposed sale prior to the execution of the release or that GM was legally obligated under its agreement with Stone to accept it. GM's approval of sale, which the president of Stone himself understood to be conditioned upon signing of the release, served as consideration for Stone's execution of the release. The release is therefore valid and bars Stone's claims against GM.[2]

■ In its cross appeal GM contends that the district court erred in denying it attorney fees and costs. GM argues that an award of fees and costs would be appropriate because Stone breached its contract of release by bringing this action and such an award would serve as contractual damages. It cites a number of cases from other jurisdictions in support, but they are not on point. In each of the cited cases the plaintiff had a contractual obligation not to file a lawsuit; the cases did not involve a claim for fees under Missouri law or a document merely releasing claims. *See Anchor Motor Freight, Inc. v. Int'l Bhd. of Teamsters,* 700 F.2d 1067, 1069 (6th Cir.1983) ("express term...providing that [plaintiff] would not bring suit"); *Widener v. Arco Oil and Gas Co., Div. of Atlantic Richfield Co.,* 717 F.Supp. 1211, 1213–14 (N.D.Tex.1989) (agreement "disc-harg[ing]...all claims...and...cove-nant[ing] not to file a lawsuit to assert such claims"); *Riveredge Associates v. Metropolitan Life Ins. Co.,* 774 F.Supp. 897, 901 (D.N.J.1991) (implied contractual obligation not to file suit in bad faith). Here, Stone did not promise to forgo litigation. Instead, its release provided GM with an affirmative defense if Stone were to bring an action against GM. Stone did not breach a contractual obligation when it filed this action or violate a contract providing for fees in the event of breach, and GM was not entitled to damages under Missouri law.

For these reasons, we affirm the judgment of the district court.

BYE, Circuit Judge, concurring in part, dissenting in part.

I join in affirming the district court's denial of attorney's fees to GM, but respectfully dissent from the portion of the opinion which holds GM provided valuable consideration for the release.

My dissent is based upon a fundamental disagreement with the majority concerning GM's contractual obligation under the Dealer Service and Sales Agreement (the "Agreement") to approve the sale of Stone to Fairground. The majority concludes GM had no obligation to approve the sale because GM retained discretion under the Agreement "to weigh the proposed dealership's qualifications and analyze its prospects for success." Admittedly, GM retained discretion under the Agreement to weigh the proposed dealer's credentials, but I submit this discretion was limited. GM limited its discretion by promising to not arbitrarily refuse approval of the sale to Fairground as long as the sale met GM's qualifications, the specific nature of which the majority sets out in its opinion. In other words, if the sale met GM's quali-

---

2. Because GM's final approval of Stone's proposed sale was consideration for the release, we need not address its other ground for consideration—its decision not to exercise its right of first refusal. We also decline to address an argument that Stone raises for the first time on appeal—that enforcement of the release would be contrary to Missouri public policy since under the MVFPA agreements which limit franchisee rights are void. Mo. Rev.Stat. § 407.825. *See DeArmon v. Burgess,* 388 F.3d 609, 614 (8th Cir.2004).

fications, GM had a contractual obligation to approve it.

All the evidence before us suggests the sale to Fairground met GM's qualifications, which should not surprise us since Fairground was already an approved and successful GM franchisee. In addition to the evidence the sale actually went forward and the inferences we may draw from that evidence, GM sent Fairground a letter dated July 8, 1997, which provided conclusive evidence of GM's satisfaction with the sale, the letter stating in relevant part:

> This will confirm the information you were given on July 8, 1997 that your application and proposal to become a Chevrolet dealer in Cuba, MO has been approved and Chevrolet is prepared to appoint Fairground Motors, LLC, in Cuba, MO, as an authorized Chevrolet dealer, conditioned upon your providing us with the following information and documentation by July 10, 1997:

The letter goes on to list the documentary items Fairground must provide. The items are simple items such as a letter of termination from Virgil Stone, tax identification numbers, copies of articles of incorporation, a blank void check, enrollment in a dealer training program, evidence of a financing plan for new vehicles, and minutes of the Fairground board of directors meeting approving the purchase. These items were mere formalities, rather than anything of meaningful substance. Thus, by their very nature it is apparent GM had already made the decision to approve the sale, as it met the specifications contained in the Agreement.

The majority dismisses the letter as a mere conditional approval. Whether the letter evinces an actual versus a conditional approval is beside the point, as all the evidence before us suggests GM had a duty under the Agreement to actually approve the sale. Nevertheless, temporarily putting aside GM's duty to approve the sale and assuming the approval was conditional, Fairground and Stone fulfilled the conditions spelled out in the letter by delivering the requested documentation.

At such time as the conditions became fulfilled, the approval was realized, even without an executed release from Stone, because the requirement of a release was not a valid condition for approval of the sale. The other documentation, although requested as mere formality, directly related to the factors for which GM agreed to consider the sale. Noticeably absent from the list of factors GM agreed to consider was the potential for litigation from the terminated franchisee. As such, GM's approval of the sale did not constitute valuable consideration for the release as GM had already approved the sale and, even if it had not, it had a preexisting contractual obligation to do so in the absence of a release as the sale otherwise met GM's qualifications. *See Zipper v. Health Midwest,* 978 S.W.2d 398, 416 (Mo. Ct.App.1998) ("a promise to do that which a party is already legally obligated to do does not constitute valid consideration.").

The majority alludes to GM's secondary argument-valuable consideration by way of its decision not to exercise the right of first refusal. GM's forbearance of the right of first refusal also cannot constitute consideration as Stone would not benefit, nor would GM incur a detriment because of it. *Penrod v. Branson R–IV Public Sch. Dist.,* 916 S.W.2d 866, 867 (Mo.Ct.App.1996) ("consideration is a benefit a party making a promise receives in return for the promise, or a loss or detriment incurred by the party to whom a promise is made."). GM did not incur a detriment by its forbearance of the right of first refusal because it no longer had such a right. GM expressed no desire to exercise the right of first

refusal, thus forfeited the right under section 12.3.1 of the Agreement. Neither can it be successfully argued that Stone benefitted from GM's forbearance of the right of first refusal. The forbearance may have benefitted Fairground, but Stone did not care which entity purchased the dealership, GM or Fairground, as long as it received fair compensation. GM's other secondary arguments concerning consideration are similarly unpersuasive.

In the event we should find the release unsupported by consideration, GM asserts the district court entered judgment on an independent ground separate and apart from the release. The district court, according to GM, found Stone had no admissible damage theory. My review of the transcript leaves me uncertain as to the district court's ruling on the matter. Because of the uncertainty of the district court's comments, combined with the confusion surrounding the district court's decision to cancel trial and enter an oral decision on the record, I would remand to the district court to consider the merits of the good faith claim, including the viability of Stone's damage theory. In part, I therefore respectfully dissent.