FEDERAL INSURANCE COMPANY, Plaintiff-Appellant and Cross-Appellee, v. BINNEY AND SMITH, INC., a Subsidiary of Hallmark Cards, Inc., Defendant-Appellee and Cross-Appellant.

First District (1st Division)    No. 1—08—0843

Opinion filed June 30, 2009.—Rehearing denied August 12, 2009.

Fred A. Smith and Kirk C. Jenkins, both of Sedgwick, Detert, Moran & Arnold LLP, of Chicago, for appellant.

Paul L. Langer and Matthew J. Morris, both of Proskauer Rose LLP, of Chicago, for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

This insurance indemnity action is drawn by the packaging of boxes of crayons and colored by the expense of settling a lawsuit directed at the packaging.

Plaintiff Federal Insurance Co. (Federal) filed a declaratory judgment action against defendant Binney & Smith, Inc. (Binney), seeking a declaration that it did not owe a duty to defend or indemnify defendant in connection with a class action lawsuit—Schwab v. Binney & Smith, Inc. (Schwab)—filed against the defendant in 2000. Binney settled the Schwab action several months after it was filed, allegedly incurring expenses of around $1 million. Binney filed a counterclaim, alleging breach of contract against Federal in connection with the Schwab action and three similar putative class actions. Following a bench trial, the trial court entered a judgment in favor of Binney for $1,013,717.76.

On appeal, Federal contends: (1) the trial court erred in finding Binney settled the Schwab action in reasonable anticipation of liability

for a covered loss; (2) the trial court erred by failing to allocate the amounts Binney paid to settle *Schwab* between the class plaintiff's claims for violation of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 2000)) and breach of express and implied warranty; (3) the trial court erred by refusing to allocate the settlement in *Schwab pro rata*, according to the number of years Federal actually insured Binney for advertising injuries; and (4) the trial court erred by awarding Binney all sums paid in connection with the *Schwab* settlement, including amounts Binney had already recovered from a settlement with another insurer. Binney cross-appeals, contending the trial court erred by not awarding prejudgment interest. We affirm in part, reverse and remand in part.

FACTS

On May 23, 2000, the Seattle Post-Intelligencer reported finding asbestos in three major brands of crayons, including the Crayola brand crayons manufactured by Binney. The asbestos was believed to be found in the talc used by crayon manufacturers as a binding agent.

In June 2000, Steven Schwab, individually and as a parent and guardian of Anne Elise Schwab, filed a national class action complaint against Binney in the chancery division of the circuit court of Cook County, Illinois—Case No. 00 CH 08354. The putative class consisted of all individuals who ever purchased Binney's Crayola-brand crayons. The class plaintiffs alleged test results showed the presence of above trace-level asbestos fibers that were of the length, size, ratio, and type known to cause cancer. The class plaintiffs in the *Schwab* action brought three causes of action against Binney: breach of implied warranty of merchantability, violation of the Illinois Consumer Fraud Act and Uniform Deceptive Trade Practices Act (815 ILCS 510/1 *et seq.* (West 2000)), and breach of express warranty. The damages sought had to do with the purchase price of the crayons.

The class plaintiffs alleged Binney's Crayola crayons packaging contained the seal of the Art and Creative Materials Institute, which says "CP NONTOXIC." On at least some of the packaging for Crayola brand crayons the label states the product is "Certified Non-Toxic." The class plaintiffs alleged Binney's crayon labels represented its crayons were "non-toxic and safe for children." In support of their Consumer Fraud Act and Deceptive Trade Practices Act claims, the class plaintiffs alleged Binney "misrepresented, concealed and/or omitted to advise plaintiffs and the Class that [Binney's] product had been manufactured with asbestos or ACMs and that their products contained asbestos fibers." Binney's product safety manager, Joan

Lilly, admitted in an affidavit that Crayola crayons have been "advertised as non-toxic on the packaging from at least 1969 through 1986."

Between 1969 and 1996, Federal issued Binney a series of comprehensive general liability insurance policies. Three of the policies provided Binney with broad defense and indemnity coverage against claims arising out of "advertising injury." The limit for advertising injury coverage under each of the policies is $500,000.

A week after the *Schwab* action was filed, Binney representatives met with the Chairman and several Commissioners of the United States Consumer Product Safety Commission (CPSC). Binney provided the CPSC with samples of its Crayola crayons for testing. A public report issued by the CPSC entitled "CPSC Staff Report on Asbestos Fibers in Children's Crayons," concluded:

> "Based on the results of the testing and evaluation, the staff concludes that the risk a child would be exposed to the fibers through inhalation or ingestion of crayons containing asbestos and traditional fibers is extremely low."

The report noted that although CPSC staff determined the risk is extremely low, as a precaution, the "crayons should not contain these fibers" and the industry should "reformulate crayons using substitute ingredients." The CPSC report noted Binney agreed to reformulate its crayons within a year to eliminate talc. The report did not call for a mandatory recall of Crayola crayons.

Six months after the *Schwab* action was filed, Binney and the class plaintiffs reached a settlement. The settlement also disposed of Sqyres v. Binney & Smith, Inc. (*Sqyres*), a companion case pending in Texas. On June 15, 2001, the Cook County chancery court approved the settlement after conducting a fairness hearing. The settlement obligations and amount of out-of-pocket costs Binney incurred totaled $1,013,717.76, excluding prejudgment interest. Under the terms of the settlement, Binney was required to: publish national advertisements in various publications containing coupons for a 75-cent credit toward the purchase of certain boxes of Crayola crayons; e-mail similar 75-cent coupons to consumers registered at the crayola.com Web site; complete reformulation of its crayons by June 6, 2001, in order to eliminate the talc that was the alleged source of the asbestos; publish and pay all costs for the production of the notice of class settlement and certification; and pay $600,000 in class attorney fees and expenses.

On September 19, 2000, Federal filed a complaint for declaratory judgment, seeking a declaration that it had no duty to defend or indemnify Binney in the *Schwab* action. The duty to defend no longer is at issue in this case. Binney filed an answer and counterclaim, alleg-

ing breach of contract against Federal in connection with the *Schwab* action and three similar putative class actions. Binney also filed a third-party complaint against Royal Insurance Company of America (Royal), seeking defense and indemnification for the *Schwab* action and two other asbestos-related lawsuits. Binney's third-party complaint was dismissed after it entered into a confidential settlement with Royal. Binney sought the full amount of its *Schwab*-related settlement costs and prejudgment interest at the rate of 5% from Federal.

Following a bench trial, the trial court found in Binney's favor. The trial court denied Binney's request for prejudgment interest. Federal appeals. Binney cross-appeals.

DECISION

I. Reasonableness of Settlement

Federal contends the trial court erred in determining it had a duty to indemnify Binney for the *Schwab* settlement. Specifically, Federal contends Binney was unable to establish it settled an otherwise covered loss in reasonable anticipation of personal liability.

We are bound by the trial court's factual findings unless they are against the manifest weight of the evidence. *U.S. Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, 619, 643 N.E.2d 1226 (1995). However, the construction of an insurance policy's provisions, and a determination of the parties' rights and obligations under that policy, are questions of law we review *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108, 607 N.E.2d 1204 (1992); *Zimmerman v. State Farm Mutual Automobile Insurance Co.*, 312 Ill. App. 3d 1065, 1068, 729 N.E.2d 70 (2000).

■ "[I]f an insured settles an underlying claim prior to verdict, it must show that it settled an otherwise covered loss in 'reasonable anticipation of personal liability.' " *U.S. Gypsum Co.*, 268 Ill. App. 3d at 625, citing *WestAmerica Mortgage Co. v. Tri-County Reports, Inc.*, 670 F. Supp. 819 (N.D. Ill. 1987); *Commonwealth Edison Co. v. National Union Fire Insurance Co.*, 323 Ill. App. 3d 970, 978, 752 N.E.2d 555 (2001). In order to recover a settlement, the insured:

> " 'need not establish actual liability to the party with whom it has settled "so long as *** a potential liability on the facts known to the [insured is] shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured]." ' " *U.S. Gypsum Co.*, 268 Ill. App. 3d at 625-26, quoting *Luria Brothers & Co. v. Alliance Assurance Co.*, 780 F.2d 1082, 1091 (2d Cir. 1986), quoting *Damanti v. A/S Inger*, 314 F.2d 395, 397 (2d Cir. 1963).

The determination of whether Binney's anticipation of liability was reasonable would turn on the "quality and quantity of proof" which Binney would expect to be offered against it in the underlying action. See *U.S. Gypsum Co.*, 268 Ill. App. 3d at 627. The burden of proving reasonableness falls on the insured both out of fairness, since the insured was the one who agreed to the settlement, and out of practicality, since the insured will have better access to the facts bearing upon the reasonableness of the settlement. *Guillen ex rel. Guillen v. Potomac Insurance Co. of Illinois*, 203 Ill. 2d 141, 163-64, 785 N.E.2d 1 (2003). The insurer, however, retains the right to rebut any preliminary showing of reasonableness with its own affirmative evidence bearing on the reasonableness of the settlement agreement. *Guillen*, 203 Ill. 2d at 164.

Binney set out the basis and rationale for its decision to settle in affidavits from Dawn Johnson, Binney's in-house counsel responsible for Binney's defense of the *Schwab* action, and Matthew Rooney, Binney's outside counsel for the *Schwab* action.

In her supplemental affidavit, Johnson said Binney believed, and continues to believe, the class plaintiffs' allegations in the *Sqyres* and *Schwab* actions were entirely without merit. Johnson noted Binney's position was supported by the independent testing conducted by the CPSC. Nevertheless, Johnson said Binney "recognized that there was risk inherent in proceeding with any litigation" when both cases would be tried by a jury.

Johnson noted that even though the CPSC concluded Binney's Crayola crayons were safe, the CPSC did find trace levels in a few crayons along with larger amounts of transitional fibers. Johnson said Binney believed the plaintiffs' class action attorneys "likely would seize on the CPSC test results" and "attempt to sway the jury with emotional arguments focusing not on the actual health risks posed by Binney's Crayola crayons, but instead on the mere presence of any asbestos or asbestos-like fibers." Binney believed "there was a very real possibility that juror confusion could lead to adverse verdicts against Binney." Therefore, even though the crayons were shown to be safe and nontoxic, and Binney believed the actions lacked merit, "Binney could not discount the very real fact that it potentially faced significant liability for the consumer fraud count in either action if forced to litigate to judgment." To avoid the possibility of liability, "Binney made the decision to pursue settlement of both actions and began negotiating."

Johnson said when the settlement negotiations "reached the point where any reasonable estimate of the amount of an adverse jury verdict, multiplied by the possibility of it occurring, exceeded the

amount for which it was anticipated Binney could settle the two actions, Matthew Rooney recommended that Binney settle the two actions." Matthew Rooney's affidavit contained substantially similar explanations as to why Binney decided to settle the claims.

A. Absolute Defense to Consumer Fraud Act and Deceptive Trade Practices Act Claims

Notwithstanding the affidavits presented in support of Binney's decision to settle, Federal contends Binney could not have reasonably anticipated liability because Binney's compliance with federal law created an absolute defense to the Consumer Fraud Act and Uniform Deceptive Trade Practices Act claims.

■ Under the Illinois Consumer Fraud and Deceptive Business Practices Act, the Consumer Fraud Act shall not apply to "[a]ctions or transactions *specifically authorized* by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." (Emphasis added.) 815 ILCS 505/10b(1) (West 2000). Similarly, the Uniform Deceptive Trade Practices Act (DTPA) provides that it does not apply to "conduct in compliance with the orders or rules of or a statute administered by a Federal, state or local governmental agency." 815 ILCS 510/4 (West 2000).

Following the release of the CPSC public report, Binney wrote a letter to the assistant executive director of the CPSC on August 18, 2000, seeking confirmation that Binney's Crayola labels complied with the Labeling of Hazardous Art Materials Act (LHAMA) (15 U.S.C. §1277 *et seq.* (2000)), which is an amendment to the Federal Hazardous Substance Act (FHSA) (15 U.S.C. §1261 *et seq.* (2000)). The associate director of the recalls and compliance division, Mary F. Toro, responded to Binney's letter on September 24, 2000. The agency letter stated:

> "[T]he only labeling required under LHAMA is a statement that the crayons conform to ASTM D—4236, which indicates that the crayons have been evaluated by a toxicologist and do not present a risk of chronic toxicity under reasonably foreseeable conditions of handling or use. We understand that the packages of the crayons are labeled with this statement. The staff review of the available data confirms that Crayola crayons are properly labeled under the FHSA and LHAMA."

The letter added, however:

> "[T]he guidance provided in this letter is based on the information provided by you on behalf of your client and the information currently available to the staff of the commission. This guidance could change if the facts change, or could be changed or superseded by the Commission."

Federal contends the CPSC agency letter provided an absolute defense to the class plaintiffs' Consumer Fraud Act and DTPA claims. We disagree.

In *Lanier v. Associates Finance, Inc.*, 114 Ill. 2d 1, 499 N.E.2d 440 (1986), our supreme court considered whether compliance with a federal statute was a defense to liability under the Consumer Fraud Act. The plaintiff instituted a class action suit against a finance company whose loan documents provided interest would be calculated using the Rule of 78's if the borrower prepaid the outstanding loan balance. The plaintiff contended the use of the Rule of 78's to calculate interest, absent an explanation regarding its effects upon early repayment, constituted common law fraud and violated the Consumer Fraud Act.

The court recognized the Consumer Fraud Act does not mandate any particular form or subject of disclosure, but rather is a general prohibition against fraud and misrepresentation. *Lanier*, 114 Ill. 2d at 17. Saying section 10b(1) of the Consumer Fraud Act does not apply to actions " 'specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States,' " the court held "conduct which is authorized by Federal statutes and regulations, such as those administered by the Federal Reserve Board, is exempt from liability under the Consumer Fraud Act." *Lanier*, 114 Ill. 2d at 17, quoting Ill. Rev. Stat. 1981, ch. 121½, par. 270b(1) (now 815 ILCS 505/10b(1) (West 2000)).

Although the court noted the Truth in Lending Act (15 U.S.C. §1601 (1982)) did not specifically address the type of disclosure required, the Federal Reserve Board's Regulation Z required " 'identification of the method of computing any unearned portion of the finance charge in the event of prepayment in full which includes precomputed interest.' " *Lanier*, 114 Ill. 2d at 12, quoting 12 C.F.R. §226 (1981). The staff of the Federal Reserve Board stated in an official interpretation that mere reference to the Rule of 78's by name was sufficient disclosure under Regulation Z. Noting the Board's formal interpretation was entitled to great deference, the court held that because defendant acted in conformity with the interpretation, it did not violate Regulation Z. *Lanier*, 114 Ill. 2d at 15-18.

The court held:

> "Because the Illinois consumer credit statutes requiring specific disclosures are met by compliance with the Truth in Lending Act, we believe that the Consumer Fraud Act's general prohibition of fraud and misrepresentation in consumer transactions did not require more extensive disclosure in the plaintiff's loan agreement than the disclosure required by the comprehensive provisions of the Truth in Lending Act." *Lanier*, 114 Ill. 2d at 17.

The supreme court held the defendant's compliance with the disclosure requirements of the Truth in Lending Act was a defense to liability under the Illinois Consumer Fraud Act. *Lanier*, 114 Ill. 2d at 18.

In *Jackson v. South Holland Dodge, Inc.*, 197 Ill. 2d 39, 755 N.E.2d 462 (2001), our supreme court again considered whether a defendant's compliance with a federal statute was a defense to liability under the Consumer Fraud Act. The specific issue was whether a car dealership and Chrysler Financial Corporation, the assignee of the car sales contract, could be held liable for the dealership's failure to disclose in the contract that it would retain a substantial portion of the amount charged for an extended warranty. Citing *Lanier*, the court held compliance with the disclosure requirements of Truth in Lending Act (TILA) (26 U.S.C. § 1601 *et seq.* (1994)) was a defense to the Consumer Fraud Act claim. *Jackson*, 197 Ill. 2d at 50. The result was based on an exemption clause in the TILA that exempted an assignee from liability unless the creditor's violation was apparent on the face of the disclosure statement. *Jackson*, 197 Ill. 2d at 50. The court held "[i]f an assignee were liable under the Consumer Fraud Act, though exempt from liability under [the] TILA, it would impose disclosure requirements on assignees beyond those mandated by federal law." *Jackson*, 197 Ill. 2d at 49-50.

However, in *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 249, 848 N.E.2d 1 (2006), our supreme court recognized it was significant that both *Lanier* and *Jackson* were "limited to the facts of the particular case." The supreme court noted *Jackson* and *Lanier* did not " 'confer a blanket immunization' from Consumer Fraud Act liability." *Price*, 219 Ill. 2d at 249, quoting *Jackson*, 197 Ill. 2d at 51-52. The court explained "mere compliance with the rules applicable to labeling and advertising is not sufficient to trigger the exemption created by section 10b(1)." *Price*, 219 Ill. 2d at 241. Instead, the conduct at issue must be " 'specifically authorized by laws administered' by the regulatory body" in order for section 10b(1) to apply. *Price*, 219 Ill. 2d at 241, quoting 815 ILCS 505/10b(1) (West 1998). "Conduct is not specifically authorized merely because it has not been specifically prohibited." *Price*, 219 Ill. 2d at 241.

The plaintiffs in *Price* contended the defendant used the terms "lights" and "lowered tar and nicotine" on its cigarette packaging and in its advertising with knowledge that those terms were deceptive and with the intent that consumers would rely on the false message in making purchasing decisions. The supreme court held the Federal Trade Commission could, and did, specifically authorize all United States tobacco companies to utilize the word "low," "lower," "reduced," "light," or similar qualifying terms on cigarette labels.

Because the defendant was specifically authorized to use the terms on its labels and in its advertising of products, the court held "any claim based on the use of these terms is barred by section 10b(1) of the Consumer Fraud Act, no matter what meaning the plaintiffs might have attributed to them." *Price*, 219 Ill. 2d at 267.

■ In this case, the CPSC agency letter sent to Binney noted "the only labeling required under LHAMA is that statement that the crayons conform to ASTM D—4236, which indicates that the crayons have been evaluated by a toxicologist and do not present a risk of chronic toxicity under reasonably foreseeable conditions of handling or use." The letter also noted a "staff review of the available data confirms that Crayola crayons are properly labeled under the FHSA and LHAMA." The Consumer Fraud Act and DTPA claims in the *Schwab* complaint were not based on Binney's use of the statement that "the crayons conform to ASTM D—4236," however. Instead, the Consumer Fraud Act and DTPA claims were based on Binney's use of the term "CP NONTOXIC" and, on some packaging, the term "Certified Non-Toxic" on its Crayola brand crayon labels.

Neither the LHAMA nor the CPSC agency letter interpreting the LHAMA "specifically authorized" Binney to use the terms "Certified Non-Toxic" or the seal "CP NONTOXIC" on its packaging. As our supreme court noted in *Price*, the "mere compliance with the rules applicable to labeling and advertising is not sufficient to trigger the exemption created by section 10b(1)." *Price*, 219 Ill. 2d at 241. Because Binney was not specifically authorized under the LHAMA to use the term "CP NONTOXIC" or Certified Non-Toxic" on its crayon labels, we find section 10b(1) of the Consumer Fraud Act and section 4 of the DTPA did not provide an absolute defense to the claims raised in the *Schwab* action. See *Price*, 219 Ill. 2d at 241 ("Conduct is not specifically authorized merely because it has not been specifically prohibited").

B. Other Issues

Federal also contends Binney could not have reasonably anticipated liability on the Consumer Fraud Act and DTPA claims because the *Schwab* class plaintiffs produced no evidence that Binney intended for the public to rely upon the statements in its labeling. Federal also contends settlement was improper because damages for the Consumer Fraud Act and DTPA claims could not have been a covered loss since the alleged injury was caused by the manufacture and sale of an allegedly defective product, not by Binney's advertising or labeling.

Contrary to Federal's contentions, the *Schwab* action contained allegations that Binney engaged in the false labeling of its products as

"non-toxic" and "safe" for use by children, that Binney "knew or should have known" its products contained asbestos that "failed to comply with the non-toxic representations on the packaging, and that the members of the class would not have purchased the crayons "had they known of the risks connected with said purchase."

We agree with the trial court's findings that Binney's allegedly false labeling could have been considered a form of advertising sufficient to support a claim for coverage arising out of an advertising injury, as defined by the Federal policies. As the trial court noted, the plaintiffs' Consumer Fraud Act claims in the *Schwab* action stemmed from allegedly fraudulent and/or deceptive conduct arising from the form of advertising Binney engaged in. The Consumer Fraud Act and DTPA claims did not directly challenge the manufacture or production of the crayons themselves.

Binney was not required to prove it was actually liable in the *Schwab* action in order to justify the settlement, as Federal's contentions seem to suggest. Binney only was required to show " ' "potential liability on the facts known to the [insured is] shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured]." ' " *U.S. Gypsum Co.*, 268 Ill. App. 3d at 625-26, quoting *Luria Brothers*, 780 F.2d at 1091, quoting *Damanti v. A/S Inger*, 314 F.2d 395, 397 (2d Cir. 1963).

In her affidavit, Johnson said when the settlement negotiations "reached the point where any reasonable estimate of the amount of an adverse jury verdict, multiplied by the possibility of it occurring, exceeded the amount for which it was anticipated Binney could settle the two actions, Matthew Rooney recommended that Binney settle the two actions." Moreover, the policies at issue specifically note Federal agreed to pay damages "even if any of the allegations of the suit against the insured are groundless, false or fraudulent."

In light of the record before us, we see no reason to disturb the trial court's decision that Binney settled in reasonable anticipation of potential liability in the underlying actions. See *U.S. Gypsum Co.*, 268 Ill. App. 3d at 625-26.

II. Allocation Between Claims

■ Federal contends the *Schwab* settlement must be allocated between the covered consumer fraud claim and the noncovered warranty claim. We disagree.

In *Commonwealth Edison Co. v. National Union Fire Insurance Co.*, 323 Ill. App. 3d 970, 752 N.E.2d 555 (2001), we said "requiring *** an actual allocation of liability *** would have acted as a chilling

effect on the settlement of [the underlying] case." *Commonwealth Edison Co.*, 323 Ill. App. 3d at 983. Relying on *U.S. Gypsum Co.*, we reasoned:

> "[R]equiring an insured *** to establish actual liability in order to receive indemnification would place the insured in the difficult position of having to refute liability in the underlying lawsuit and then, after obtaining a settlement, turn around and prove its own liability in order to succeed in a subsequent insurance coverage action." *Commonwealth Edison Co.*, 323 Ill. App. 3d at 983, citing *U.S. Gypsum Co.*, 268 Ill. App. 3d at 626.

We held an allocation between covered and noncovered claims was unnecessary where the plaintiff demonstrated the primary focus of the underlying litigation was a covered loss and it settled in reasonable anticipation of that litigation. *Commonwealth Edison Co.*, 323 Ill. App. 3d at 982-83.

Here, there is no way to decipher how much, if any, of the *Schwab* settlement was attributable to the warranty claims. To do so would require a mini-trial. Binney sufficiently demonstrated it settled the *Schwab* case in reasonable anticipation of liability under the consumer fraud count. Johnson's affidavit in support of the settlement specifically noted "Binney could not discount the very real fact that it potentially faced significant liability for the consumer fraud count in either action if forced to litigate to judgment." The consumer fraud count was a covered loss under the Federal policies at issue.

We find Binney was not required to allocate the liability within the settlement.

III. *Pro Rata* Allocation

Federal contends Binney was required to show what portion of the settlement, if any, related to advertising injuries arising from offenses committed during the effective periods of coverage under the Federal policies. Federal contends the plain language of the policies at issue indicate Binney is entitled only to indemnity for "all sums" paid as a result of injury to a claimant arising from an enumerated offense committed during the three years Federal provided Binney advertising injury coverage—1981, 1984, and 1985. Federal contends that if Binney is unable to specifically allocate individual claims to the relevant policy, Illinois law provides the entire loss should be allocated *pro rata* according to each insurer's time on the risk.

The trial court found the clear language of the subject policies provided Federal would pay Binney "all sums" Federal became legally obligated to pay as damages because of an advertising injury. The trial court found Federal was "jointly and severally liable for coverage

obligations to the extent of the limits of each Policy triggered." The court noted the advertising and labeling of the crayons the *Schwab* plaintiffs challenged extended over the policy periods of the subject Federal policies, affording coverage for "an advertising injury" up to the respective policy limits.

An insured is entitled only to indemnity for losses that fall within the terms of its policy. *Fidelity & Casualty Co. of New York v. Mobay Chemical Corp.*, 252 Ill. App. 3d 992, 1003, 625 N.E.2d 151 (1992). "Whether a loss falls within the terms of the policy is determined not only by analyzing whether the type of loss is covered by the policy, but also by determining whether the loss falls within the effective dates of coverage." *Fidelity & Casualty Co. of New York*, 252 Ill. App. 3d at 1003.

The general liability insurance policies that contain the advertising injury coverage were effective from December 31, 1980, to December 31, 1981; December 31, 1983, to January 1, 1985; and January 1, 1985, to January 1, 1986. The 1985 to 1986 policy, which is representative of the terms of all three general liability policies at issue here, provides:

> "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or advertising injury to which this insurance applies, sustained by any person or organization and arising out of the conduct of the named insured's business, within the policy territory, against the insured seeking damages on account of such injury, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgment or settlements."

An "advertising injury" is defined in the policies as:

> "injury arising out of an offense committed during the policy period in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, privacy, unfair competition, or infringement of copyright, title or slogan."

Binney contends the trial court's use of an "all sums" approach was appropriate in this case given the policy language used in the Federal policies, citing *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23, 514 N.E.2d 150 (1987), and *Benoy Motor Sales, Inc. v. Universal Underwriters Insurance Co.*, 287 Ill. App. 3d 942, 679 N.E.2d 414 (1997).

In *Zurich Insurance Co.*, our supreme court addressed the trigger of insurance coverage in cases involving bodily harm from asbestos exposure. The court noted in most cases more than one insurance carrier would be obligated to provide for an asbestos-related disease. The court was asked to consider whether each carrier whose policy was triggered was jointly and severally liable for the total indemnity and defense costs of a claim without proration.

Our supreme court noted that in *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980), the court held the insurers' obligations under their respective policies were triggered only by a claimant's exposure to asbestos during a policy period. From that premise, the *Forty-Eight Insulations* court held the exposure theory provided a reasonable means of allocating the costs of defense and indemnification among the triggered policies based on the number of years of exposure. *Zurich Insurance Co.*, 118 Ill. 2d at 57.

The supreme court noted the policy language provided the insurer would " 'pay on behalf of [the insured] all sums which [the insured] shall become legally obligated to pay as damages because of *** bodily injury *** caused by an occurrence.' " *Zurich Insurance Co.*, 118 Ill. 2d at 56. The policy language did not provide for proration. The court held an insurer must afford Raymark coverage of a claim if the claimant suffers bodily injury or sickness or disease during a policy period. The triple-trigger for coverage meant several different insurance policies would be implicated by a single claimant's asbestos exposure claim. Having rejected the premise that underlined *pro rata* allocation in *Forty-Eight Insulations*, the supreme court concluded the appellate court did not err in declining to order *pro rata* allocation of the indemnity obligations among the triggered policies. *Zurich Insurance Co.*, 118 Ill. 2d at 57.

In *Benoy Motor Sales, Inc.*, the Illinois Environmental Protection Agency sued 10 automobile dealerships for recovery of any costs incurred because of the release of hazardous substances at the Lenz Oil facility. The dealerships sold used crank oil to Lenz Oil, which leaked at the Lenz Oil site and contaminated the groundwater. Sometime between 1977 and 1985, the dealerships purchased "Unicover" broad coverage insurance policies from Universal. The trial court found Universal was obligated only to pay each dealer that part of the settlement amount and defense costs which related to shipments of oil that occurred while an insurance policy was in effect. Shipments made during gaps in coverage were not to be included in the recovery. We reversed.

Although we recognized there were gaps in coverage, we held the policies anticipated the continuing nature of pollution damage. *Benoy Motor Sales, Inc.*, 287 Ill. App. 3d at 947. The Unicover III policy, for instance, said: " 'All injury arising out of continuous or repeated exposure to substantially the same general conditions will be considered as arising out of one occurrence.' " *Benoy Motor Sales, Inc.*, 287 Ill. App. 3d at 947-48. We noted environmental pollution does not stop and start in discrete time periods. There is a continuing process. *Benoy Motor Sales, Inc.*, 287 Ill. App. 3d at 948. We held when property damage is deemed to have occurred continuously for a fixed period—" 'every insurer on the risk at any time during the trigger period is jointly and severally liable to the extent of their policy limits.' " *Benoy Motor Sales, Inc.*, 287 Ill. App. 3d at 948, quoting *U.S. Gypsum Co.*, 268 Ill. App. 3d at 644. Reversing the trial court, we concluded coverage "should not be excluded for any dealer insured by Universal while the pollution process was occurring." *Benoy Motors, Inc.*, 287 Ill. App. 3d at 948. We were not asked to specifically address the issue of *pro rata* allocation.

Illinois courts have recognized there are times where a *pro rata* apportionment of damages is appropriate.

In *AAA Disposal Systems, Inc. v. Aetna Casualty & Surety Co.*, 355 Ill. App. 3d 275, 821 N.E.2d 1278 (2005), the court considered whether the trial court erred by holding the excess-policy insurer liable only after horizontal exhaustion of the primary insurers' coverage and only for its *pro rata* share over the coverage period. Intervenors argued American Employers were jointly and severally liable for all sums regardless of when the damages occurred based on the use of "all sums" language in the excess policies. The court held the intervenors' argument ignored the plain and ordinary meaning of the policy period language in the policies at issue, which provided: "This policy applies only to occurrences, as herein defined, which happen during the policy period."

The court held that to "allow intervenors to reach into the future and include every occurrence would eviscerate the policy period contained in the policies." *AAA Disposal Systems, Inc.*, 355 Ill. App. 3d at 286-87. Nothing in the policies indicated the insurer "intended to provide coverage past the finite policy period." *AAA Disposal Systems, Inc.*, 355 Ill. App. 3d at 287.

Even though the three Federal policies in this case contained "all sums" language, the policies also contained limiting language in the definition of "advertising injury." The language limits the definition of an "advertising injury" to offenses "committed during the policy period in the course of the named insured's advertising activities." A

policy period limitation to coverage is exactly what was missing from the insurance contracts at issue in *Zurich*, allowing for the proper application of joint and several liability under the "all sums" rule.

Although Binney correctly notes it was only required to show it settled in "reasonable anticipation of liability," Binney still had the burden of showing it settled "an otherwise covered loss." See *Commonwealth Edison*, 323 Ill. App. 3d at 978. Under the explicit terms of the policy, advertising injuries arising from offenses committed outside of the applicable policy periods would not be covered. See *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 283 Ill. App. 3d 630, 642, 670 N.E.2d 740 (1996) ("While the insurers agreed to indemnify OMC for 'all sums,' it had to be for sums incurred during the policy period"). Nothing in the Federal policies indicated Federal intended to provide coverage for advertising injuries past the finite policy period. See *AAA Disposal Systems, Inc.*, 355 Ill. App. 3d at 286-87.

In *Illinois Central R.R. Co. v. Accident & Casualty Co. of Winterthur*, 317 Ill. App. 3d 737, 751-52, 739 N.E.2d 1049 (2000), this court considered a trial court's allocation of damages resulting from a settlement in a discriminatory hiring practices class action lawsuit. Because the applications for employment at issue were submitted over several years, excess insurance policies issued during successive periods were triggered.

Although the discriminatory practices were ongoing and consistent for a period of several years, the actual injury triggering coverage occurred when each individual potential employee submitted an employment application. Each exercise of Lane's authority in hiring in a discriminatory manner against a member of the class resulted in "a separate and discrete occurrence," not a single ongoing occurrence. *Illinois Central R.R. Co.*, 317 Ill. App. 3d at 748-49. See also *Roman Catholic Diocese of Joliet, Inc. v. Lee*, 292 Ill. App. 3d 447, 455-56, 685 N.E.2d 932 (1997) (Repeated molestation of a minor by a priest did not constitute a single ongoing occurrence. Instead, each "exposure" of the minor to the negligently supervised priest constituted a separate occurrence that provided the basis for indemnification); *Mason v. Home Insurance Co.*, 177 Ill. App. 3d 454, 532 N.E.2d 526 (1988) (rejecting notion that the patrons' claims arose out of one uninterrupted and continuing cause, court held each incident in which a restaurant served tainted food to a patron was a separate occurrence).

With regard to allocating settlement damages, the court noted Illinois Central was able to provide the trial court with employment applications for only 267 out of the 583 class action members. The trial court allocated the settlement damages resulting from those denied applications to the policies in effect at the time the applications were

made. As for the remaining 316 class members for whom Illinois Central was unable to provide applications, the trial court allocated their damages horizontally among the insurance policies in effect during the time covered by the class definition, using a *"pro rata* time-on-the-risk formula." *Illinois Central R.R. Co.,* 317 Ill. App. 3d at 751-52. This court upheld the trial court's allocation of damages, finding:

> "The damages to those class members [whose applications were available] were properly allocated to the policy in effect at the time the application was made and, as previously stated, therefore triggered. \*\*\* [T]he circuit court allocated the damages for the class members for whom no application was available and the legal fees using a *pro rata* time-on-the-risk method. This, we consider, was proper under the circumstances presented here." *Illinois Central R.R. Co.,* 317 Ill. App. 3d at 753.

■ In this case, to trigger coverage under the "advertising injury" provision of the Federal policies and receive indemnification, Binney was required to show an "injury arising out of an offense committed during the policy period in the course of the named insured's advertising activities." Although Binney's labeling of its crayons as nontoxic was ongoing and consistent from at least 1969 to 1986, the actual advertising injury occurred when an individual class member purchased a box of Crayola crayons in reliance on the labeling during a policy coverage period. See *Illinois Central R.R. Co.,* 317 Ill. App. 3d at 748-49; *Roman Catholic Diocese of Joliet, Inc.,* 292 Ill. App. 3d at 455-56.

We agree with Federal that in order to trigger coverage, Binney had to establish which portion of the settlement related to class members who purchased Crayola crayons during the relevant policy periods at issue—from December 31, 1980, to December 31, 1981; from December 31, 1983, to January 1, 1985; or from January 1, 1985, to January 1, 1986. See *Illinois Central R.R. Co.,* 317 Ill. App. 3d at 751-52. Binney cannot shift its responsibility for advertising injuries that occurred outside of the policy periods to Federal based solely on the "all sums" language found in the policies. See *Outboard Marine Corp.,* 283 Ill. App. 3d at 642.

In light of the separate and distinct nature of the occurrences at issue here, we find the trial court erred in determining Federal was required to pay Binney "all sums" Binney became legally obligated to pay as damages because of an advertising injury, regardless of whether the claimed injury occurred during the policy period.

On remand, we direct Binney to define when the various class members who were part of the settlement actually purchased Crayola brand crayons, triggering the advertising injury at issue here—

purchase price of the crayons. Federal would then be responsible for the portion of the settlement damages that relates to injuries that occurred while the Federal policies at issue provided Binney with advertising injury coverage. If Binney is unable to establish which portion of the settlement damages related to class member injuries incurred during the covered time period, settlement damages should be apportioned using a *pro rata* time-on-the-risk formula. See *Illinois Central R.R. Co.*, 317 Ill. App. 3d at 751-52. Because Federal provided Binney advertising injury coverage during only 3 years of the approximately 30-year period at issue here where Binney advertised its crayons as nontoxic, we agree with Federal that it should not be liable for more than approximately one-tenth of the total settlement under a *pro rata* time-on-the-risk formula.

IV. Double Recovery

■ Federal contends the trial court erred when it declined to reduce Binney's judgment to account for money already recovered by Binney from Royal. Binney contends the trial court accurately denied contribution under the Joint Tortfeasor Contribution Act (740 ILCS 100/2(c) (West 2000)). Binney further contends Federal was not entitled to a setoff.

Federal has not waived review of this issue. See *Dial v. City of O'Fallon*, 81 Ill. 2d 548, 558, 411 N.E.2d 217 (1980) (supreme court *sua sponte* remanded case to determine whether a setoff was appropriate in order to prevent double recovery); *Barkei v. Delnor Hospital*, 207 Ill. App. 3d 255, 264, 565 N.E.2d 708 (1990) (the time limit for enforcement of judgments is seven years and a supplemental proceeding may be made within that time limit).

Federal is not requesting a setoff; it is requesting a reduction in the damages award. Federal contends the damages should be reduced in order to compensate for the unknown amount already recovered by Binney pursuant to its settlement with Royal in connection with the *Schwab* action.

*Hentz v. Unverfehrt*, 237 Ill. App. 3d 606, 604 N.E.2d 536 (1992), is instructive:

> "Setoff refers to the situation when a defendant has a distinct cause of action against the same plaintiff who has filed suit against him. [Citation.] The procedural concept of setoff is now subsumed under the term 'counterclaim.' [Citations.] What [defendant] is seeking is, in essence, a bare reduction of damages received by [plaintiff] from another source. In tort cases, a payment by one tortfeasor diminishes a plaintiff's claim against all other tortfeasors responsible for the same harm in order to ensure that the

plaintiff receives only one satisfaction for any one injury. [Citations.] A similar rule applies in contract cases. The purpose of contract damages 'is to place the nonbreaching party in the position he would have been in had the contract been performed, but *not to place him in a better position or provide him with a windfall recovery.*' (Emphasis added.) [Citation.] The underlying current behind both rules is that a plaintiff's claimed damages are to be reduced by any payments he has received in compensation for the same harm or injury. The key here is same harm or injury." *Hentz,* 237 Ill. App. 3d at 612-13.

The law is clear: "[F]or one injury there should only be one recovery irrespective of the availability of multiple remedies and actions." *Robinson v. Toyota Motor Credit Corp.,* 201 Ill. 2d 403, 422, 775 N.E.2d 951 (2002) (barring double recovery of damages pursuant to claims brought under federal and state statutes). Illinois public policy prohibits double recovery. See *SJS Investments, Ltd. v. 450 East Partnership,* 232 Ill. App. 3d 429, 433, 597 N.E.2d 1213 (1992) (a plaintiff who elected the return of its earnest money under a real estate contract could not also obtain specific performance). It bears repeating that "[t]he purpose of damages is to place the nonbreaching party in a position that he or she would have been in had the contract been performed, *not to provide the nonbreaching party with a windfall recovery.*" (Emphasis added.) *Jones v. Hryn Development, Inc.,* 334 Ill. App. 3d 413, 418, 778 N.E.2d 245 (2002).

Here, Binney negotiated a private settlement with the third-party insurer Royal. The substance of that settlement has not been disclosed. However, it is clear the Royal settlement compensated Binney for the same harm or injury, namely, the *Schwab* action, upon which it seeks damages here. Failure to account for the Royal settlement has the potential of providing Binney with a windfall. Instead of placing Binney in the position it would have been in had Federal indemnified it for the *Schwab* settlement, the trial court allowed Binney to receive a potential double recovery. We cannot say with certainty Binney received a double recovery because we are not privy to the terms of the Royal settlement. We remand this cause to the trial court with instructions to review the Royal settlement and make findings regarding whether the settlement, in conjunction with the damages awarded in this case, resulted in an impermissible double recovery. If it did, the trial court should adjust the judgment amount accordingly.

V. Prejudgment Interest

■ Binney contends that in addition to the principal amount of costs incurred in connection with its settlement of the *Schwab* action,

it is entitled to prejudgment interest at a rate of 5% under the Illinois Interest Act (815 ILCS 205/2 (West 2000)).

Section 2 of the Act provides:

"Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing." 815 ILCS 205/2 (West 2000).

We will reverse a trial court's determination as to whether prejudgment interest is warranted only if it is against the manifest weight of the evidence. *Krantz v. Chessick*, 282 Ill. App. 3d 322, 327, 668 N.E.2d 77 (1996).

In denying prejudgment interest, the trial court found:

"After considering all relevant facts, including the nature of the genuine dispute initiated by Federal's declaratory judgment action and that Federal has paid defense costs pursuant to an earlier court ruling, this court declines to exercise its discretion in awarding interest as claimed by Binney."

Based on the record before us, we see no reason to disturb the trial court's finding.

CONCLUSION

We affirm in part, reverse in part, and remand the cause for proceedings consistent with our opinion.

Affirmed in part; reversed and remanded in part.

R. GORDON, P.J., and HALL, J., concur.