# United States Court of Appeals
### For the Eighth Circuit

_____

## No. 12-4012
_____

Chicago Insurance Company

*Plaintiff - Appellee*

v.

Archdiocese of St. Louis; Robert J. Carlson, Archbishop

*Defendants - Appellants*

Father Michael S. McGrath

*Defendant*

------------------------------

Archdiocese of St. Louis; Robert J. Carlson

*Counter Claimants - Appellants*

v.

Lloyd's London and London Companies

*Counter Defendant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 24, 2013
Filed: January 29, 2014
_____

Before WOLLMAN, BEAM, and SMITH, Circuit Judges.
_____

BEAM, Circuit Judge.

In this insurance coverage dispute, the Archdiocese of St. Louis and Archbishop Robert J. Carlson (collectively, the "Archdiocese") appeal from the district court's[1] grant of summary judgment in favor of their insurer, Chicago Insurance Company ("CIC"). Because the Archdiocese has failed to establish coverage, we affirm.

## I.    BACKGROUND

On June 10, 2003, Allen Klump, the father of Christopher Klump, commenced several claims against the Archdiocese in Missouri state court, premised on the theory that a priest employed by the Archdiocese sexually molested Christopher, eventually leading to Christopher's suicide. The Archdiocese moved to dismiss for failure to state a claim, and the state trial court dismissed all but three claims against the Archdiocese. Of the three claims that remained viable against the Archdiocese, Count I ("the wrongful death claim") alleged that the Archdiocese "inappropriately, recklessly and or intentionally placed young Christopher Klump in a knowingly dangerous environment . . . which acts caused young Christopher Klump emotional and psychological" harm and directly caused or contributed to Christopher's death. The remaining two claims alleged that the Archdiocese engaged in intentional conduct. Subsequently, the parties entered into a settlement that released the Archdiocese from any future liability associated with the alleged misconduct. After

_____

[1]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

paying Allen Klump the settlement amount, the Archdiocese turned to its insurers for indemnification.

At times relevant to this dispute, the Archdiocese held excess liability insurance policies with Certain Underwriters at Lloyd's London and The London Companies ("Lloyd's")[2] as a primary excess carrier and with CIC as a secondary excess carrier. The Lloyd's policy agreed "to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law or assumed by the Named Assured under contract or agreement . . . on account of personal injuries . . . arising out of any occurrence." The CIC policy explicitly incorporated the terms of the Lloyd's policy but contained additional language. Specifically, the CIC policy promised to indemnify the Archdiocese for an enumerated amount of loss and defined the term "loss" as "the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable." "Loss" also included "investigation, adjustment, defense or appeal costs, and expenses, costs and expenses incident to any of the same."

CIC denied the Archdiocese's demand for coverage, and on June 23, 2009, CIC commenced action against the Archdiocese in federal court, seeking a declaration that its policy did not provide coverage for the underlying litigation. CIC then moved for summary judgment. In resolving the coverage issue, the district court determined that because the wrongful death claim in the underlying complaint alleged a form of negligence against a religious organization, the Archdiocese could not be held legally liable under current Missouri Supreme Court precedent. If the insured could not be held legally liable, the court reasoned, the Archdiocese failed to establish that a defined "loss" occurred. Further, because the remaining underlying claims against the Archdiocese alleged intentional conduct, they did not fit within the policy's definition

---

[2]The Archdiocese has voluntarily dismissed Lloyd's from this appeal.

of "occurrences."[3]  Accordingly, the district court concluded that CIC's policy did not provide coverage for the underlying claims and granted the insurer's motion for summary judgment.  The Archdiocese now appeals.

## II.    DISCUSSION

In Gibson v. Brewer, the Supreme Court of Missouri concluded that negligence-based actions against a religious organization that require a court to evaluate the reasonableness of religious doctrine, policy and administration offend the First Amendment and cannot be maintained.  952 S.W.2d 239, 249-50 (Mo. 1997).  Our task on this appeal is to determine how Gibson impacts the present coverage dispute in light of the specific policy language.  We review de novo the district court's interpretation of the policies at issue, as well as its ultimate grant of summary judgment.  Doe Run Res. Corp. v. Lexington Ins. Co., 719 F.3d 868, 870 (8th Cir. 2013).  The parties agree that Missouri law applies to this diversity case.

We begin with the actual language of the policy, which agrees to indemnify the Archdiocese for "sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable."  Although the policy does not define the term "legally liable," it is generally understood that "[t]he term 'legal liability,' as used in a policy of insurance, means a liability such as a court of competent jurisdiction will recognize and enforce between parties litigant."  Steven Plitt et al., 7A Couch on Insurance § 103:14 (2013 rev. ed.).  In a practical sense, the term "legal liability" serves to limit the insuring clause as "the fact that a loss is occasioned through the fault of the insured does not alone trigger the insurer's liability."  Id.  Thus, "[a] common requirement is that the insured be legally liable for the third party's claim before there is such a loss as the insurer is obligated to pay."

_____

[3]The Archdiocese has not appealed the district court's judgment on the claims involving intentional conduct.

Id. Recognizing these general principles, long ago in <u>Brinkman v. Western Automobile Indemnity Assoc.</u>, the Missouri Court of Appeals held that to recover under a pure indemnity policy, the insured must show "that he was legally liable to [the injured claimant], and that the amount of the settlement he made and the other items demanded are reasonable, and the burden is on him to so show." 218 S.W. 944, 946 (Mo. Ct. App. 1920). With this backdrop, we turn to the Archdiocese's arguments.

Nearly all of the Archdiocese's arguments stem from one common claim of error. That is, the district court erred, the Archdiocese asserts, by requiring it to establish *actual* liability to trigger coverage. According to the Archdiocese, Missouri law only requires that it show *potential* liability to trigger indemnification of its settlement. Even if we assume that Missouri follows a potential liability standard–a question we need not decide–under the unique circumstances of this case, the Archdiocese is unable to show that it faced potential liability in the underlying action.

The Missouri Court of Appeals has recognized that Missouri law "does not require the insured, as a condition of reimbursement, to prove that it is ultimately liable for the settled claims." <u>Hyatt Corp. v. Occidental Fire & Cas. Co. of N.C.</u>, 801 S.W.2d 382, 388 (Mo. Ct. App. 1990). To the extent this statement indicates the court's endorsement of the potential liability standard, the case provides little guidance in the present dispute for two reasons. First, at the time the insured settled in <u>Hyatt</u>, the claims pending against the insured "were not automatically precluded under Missouri law." <u>Id.</u> at 389 (quotation omitted). Second, <u>Hyatt</u> involved a situation where the insurer breached its duty to consider offers of settlement in good faith, allowing the insured to bind the insurer to a reasonable settlement with the claimants. <u>Id.</u> at 388-89. Therefore, because Missouri courts have not specifically dealt with the coverage issue under the circumstances we now confront, we turn to other jurisdictions for guidance concerning the potential liability standard. <u>Balke v. Cent.</u>

Mo. Elec. Coop., 966 S.W.2d 15, 22 (Mo. Ct. App. 1997) ("[W]e look to other jurisdictions which have addressed this issue for guidance.").

In Luria Bros. & Co. v. Alliance Assurity Co., the Second Circuit explained the potential liability standard:

> In order to recover the amount of the settlement from the insurer, the insured need not establish actual liability to the party with whom it has settled so long as . . . a potential liability on the facts known to the [insured is] shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured].

780 F.2d 1082, 1091 (2d Cir. 1986) (alterations in original) (internal quotation omitted). Under this standard, "[i]f an insured settles an underlying claim prior to verdict, it must show that it settled an otherwise covered loss in reasonable anticipation of liability." Fed. Ins. Co. v. Binney & Smith, Inc., 913 N.E.2d 43, 48 (Ill. Ct. App. 2009) (internal quotation omitted). And, consistent with Luria Bros. and Binney, the Missouri Court of Appeals has indicated that an insured contemplating settlement should "take into consideration the likelihood of success or failure" on the merits, among other factors. Hyatt, 801 S.W.2d at 389 (emphasis and internal quotation omitted).

Here, even if we apply the standard the Archdiocese advocates, the Archdiocese is unable to show that it settled "in reasonable anticipation of liability," Binney, 913 N.E.2d at 48, or "in an amount reasonable in view of the . . . degree of probability of claimant's success against the [insured]," Luria Bros., 780 F.2d at 1091 (second alteration in original). To be sure, the Supreme Court of Missouri in Gibson rejected several negligence-based claims against a Catholic Diocese stemming from the alleged sexual misconduct of a priest. 952 S.W.2d at 249-50. In rejecting the negligence claims, the court opined that "[w]hether negligence exists in a particular situation

-6-

depends on whether or not a reasonably prudent person would have anticipated danger and provided against it. In order to determine how a 'reasonably prudent Diocese' would act, a court would have to excessively entangle itself in religious doctrine, policy, and administration." Id. (internal citation omitted). And, here, the Gibson rule logically extends to the allegations of recklessness in the wrongful death claim. See Nichols v. Bresnahan, 212 S.W.2d 570, 573 (Mo. 1948) (defining reckless conduct to include "knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him." (quotation omitted)); Hatch v. V.P. Fair Found., Inc., 990 S.W.2d 126, 139 (Mo. Ct. App. 1999) (highlighting that "[r]ecklessness is an aggravated form of negligence," and "[i]t is applied to conduct which is negligent, rather than intentional"). Based on Gibson's application of the First Amendment, the Archdiocese has failed to show settlement was in *reasonable* anticipation of liability. Thus, the Archdiocese did not "affirmatively establish that [it] was legally liable"–potentially or otherwise–for the conduct alleged in the wrongful death claim, and we conclude the Archdiocese is not entitled to indemnity coverage under CIC's policy. Brinkman, 218 S.W. at 946.[4]

Notwithstanding the Archdiocese's assertions to the contrary, we are aware of no authority, and the Archdiocese cites none, that allows a settling insured to recover under an indemnity policy where governing law does not permit the claimant's

---

[4]The Archdiocese seems to suggest that, even in light of the Gibson decision, it still faced potential liability because Gibson is a minority view that is subject to possible reversal and changes in the law. Although Gibson has been challenged, we think the point is irrelevant as virtually every law is subject to possible change or reconsideration at some unknown time. Ultimately, Gibson remained the law of Missouri when the Archdiocese settled, see, e.g., Weaver v. African Methodist Episcopal Church, Inc., 54 S.W.3d 575, 586 (Mo. Ct. App. 2001), and continues to enjoy validity today, see, e.g., D.T. v. Catholic Diocese of Kansas City-St. Joseph, No. WD 76025, 2013 WL 5979189, at *4-5 (Mo. Ct. App. Nov. 12, 2013).

underlying cause of action against the insured. Moreover, our conclusion harmonizes with cases applying the potential liability standard and fits within the broader context of Missouri's insurance coverage jurisprudence. Indeed, in <u>Luria Bros.</u>, the court made clear that even under a potential liability standard, governing law affecting the settling insured's underlying liability remains significant for coverage purposes. 780 F.2d at 1091 (noting that while the insured generally owed no duty to claimants, potential liability existed because an exception to the general rule may have applied under the unique circumstances). <u>Binney</u>, too, examined whether governing law provided the insured an absolute defense to the claims asserted in the underlying action, ultimately concluding an absolute defense was not available to the insured. 913 N.E.2d at 50, 52. While we agree with the Archdiocese that an insured must evaluate several risks in contemplation of settlement, these cases applying the potential liability standard also reveal that the insured must remain cognizant of the underlying liability rules, which the Archdiocese failed to appreciate in this case.

And, when we move past the specific context of settlement, Missouri cases confirm that if governing rules preclude the underlying action against the insured, the insured is not entitled to coverage. <u>See, e.g.</u>, <u>Auto Owners (Mut.) Ins. Co. v. Sugar Creek Mem'l Post No. 3976</u>, 123 S.W.3d 183, 192 (Mo. Ct. App. 2003) (determining that insured tavern not entitled to liability coverage because negligence claims alleged against the insured not recognized under governing dram shop liability law); <u>cf., e.g.</u>, <u>Oates v. Safeco Ins. Co. of Am.</u>, 583 S.W.2d 713, 716 (Mo. 1979) (opining that to recover uninsured motorist benefits, the insured must show the uninsured motorist is legally liable, and a substantive limitation in the underlying tort action against such motorist precludes recovery from insurer). We see no reason why Missouri would apply a different rule in the settlement context.

Next, the Archdiocese complains that the district court's ruling second-guesses the state court's prior order concerning the Archdiocese's motion to dismiss. Essentially, the Archdiocese seems to believe that once the state court denied its

motion to dismiss as to the wrongful death claim, the coverage issue was decided, and the district court could not later determine that an underlying legal liability did not exist for coverage purposes. In the words of the Archdiocese, "the [state] trial court wore the robe that matters." The Archdiocese cites no authority for this proposition, and the argument lacks merit. For one thing, when the state court evaluated the motion to dismiss with regard to the wrongful death claim, it solely focused on whether the complaint sufficiently alleged facts showing that the Archdiocese caused Christopher to commit suicide. Indeed, the state court's order does not even mention Gibson. For another thing, the wrongful death claim alleged both reckless and intentional conduct–the intentional aspect of the claim remained viable even after Gibson. See 952 S.W.2d at 248 ("Religious conduct intended or certain to cause harm need not be tolerated under the First Amendment."). In the end, the district court did not reevaluate the state court's judgment but merely considered an issue pertaining to insurance coverage that had not been previously examined.[5]

Finally, for the first time in this litigation, the Archdiocese attempts to offer a new construction for the policy's definition of "loss." The Archdiocese concedes it did not raise this argument before the district court. Having failed to present this policy construction argument to the district court, we decline to address it for the first time

_____

[5]Before the district court and on appeal, the Archdiocese primarily challenged the district court's ruling concerning the wrongful death claim–a claim left viable by the state trial court's dismissal order. In passing, however, the Archdiocese also indicates that the several other claims the state trial court did dismiss may have triggered coverage under a potential liability standard because the dismissals were interlocutory and remained subject to reconsideration or appeal. The Archdiocese does not offer any meaningful analysis on this point, nor does it parse each dismissed claim and explain how it triggered specific coverage under the policy and potential liability standard. We decline to undertake such a venture on their behalf. See Ulrich v. Pope Cnty., 715 F.3d 1054, 1059 n.4 (8th Cir. 2013) (refusing to consider issue where party did not provide "meaningful argument" separate from other issue).

on appeal.  <u>Stone Motor Co. v. Gen. Motors Corp.</u>, 400 F.3d 603, 608 n.2 (8th Cir. 2005).

## III.  CONCLUSION

We affirm the judgment of the district court.

_____